STELLA JABLONOWSKI v. MODERN CAP MANU-
FACTURING COMPANY, Appellant.

In Banc, December 30, 1925.

1. **NEGLIGENCE:** Instruction: Failing to State Facts Constituting
   Negligence: Supplied by Others. Instructions must be read and con-
   sidered in connection with each other. What acts constitute negli-
   gence are to be ascertained from all the instructions given. Four-
   teen sewing machines, set upon a table, were operated automatical-
   ly by electric power, supplied to them by rods which ran beneath
   the table ten or twelve inches above the floor. To protect the skirts

of girl operators, who sat on chairs directly in front of the machines, from becoming entangled in the power rods, shield boards were placed lengthwise on both sides of the table, the ends of the boards being fitted or slipped into slots or grooves molded in the iron standards of the table. Plaintiff, an operator of one of said machines, claimed that one of such shield boards was permitted to become loose and to lie in the aisle, and as she, having completed her work on an allotment of caps and gathered a bundle of them in her arms, attempted to carry them to the finishing room, she stumbled over said board, fell to the floor, and was badly injured. *Held*, that an instruction authorizing a verdict for plaintiff if the jury found that "the defendant, or its agents, placed said board on the floor of said aisle, and negligently failed to remove same from the floor," was not erroneous in failing to state what facts constituted a negligent failure to remove the board, nor did it leave to the jury to determine what constituted negligence in failing to remove it, where the instruction further required the jury to find that plaintiff tripped over a shield board and was injured, that the board was lying in an aisle or passageway provided by defendant and in common use by its employees in the performance of their duties, and that said passageway with said board lying therein was not reasonably safe for the use of said employees in performing their duties, and another instruction was given telling the jury that "the word 'negligence' or 'negligently' as used in these instructions means the failure to use ordinary care, and the term 'ordinary care' means such care as a reasonably prudent person would use under the same or similar circumstances."

2. ————: **Act of Agent: Knowledge of Defendant.** An instruction authorizing a verdict for plaintiff if the jury find that "the defendant or its agents" placed a board in the aisle of a factory over which plaintiff in the performance of her duties tripped and fell, and negligently failed to remove it, and thereby rendered the aisle an unreasonably unsafe passageway, is not error, where the evidence is that the president and general manager of the defendant corporation and he alone placed the board in the aisle, although it does not require that he or any other person as agent of defendant knew or by the exercise of ordinary care could have known that the board was in the aisle in time by the exercise of ordinary care to have removed it before plaintiff was injured. In such case his act was the act of the defendant, and it had actual knowledge thereof.

3. ————: **Unsafe Place: Obstruction on Floor: Contributory Negligence: Duty to Look: Assumption of Risk: Instructions.** In the absence of knowledge to the contrary, it is the right of the employee to assume that her master has provided a reasonably safe place for the performance of the duties connected with her employment.

and she is not required to·anticipate that he has negligently failed to provide a safe place, but if she knows the place is dangerous she must use ordinary care to avoid injury. Where plaintiff, having prepared at her sewing machine an allotment of caps, in order to take them to the finishing room gathered them in her arms in a bundle which extended from her waist to her chin, and in passing around the corner of the table stumbled and fell over a board in the aisle, not knowing it was there, although she testifies to having seen the board in the aisle on previous occasions, an instruction telling the jury that it was defendant's duty to use ordinary care to discover and remove unsafe and dangerous obstructions in the aisle, and that "plaintiff was not required to look for obstructions in the aisle before using same, but was only required to use the ordinary care that a reasonably prudent person would use in the same or similar situation in walking in said aisle," is not erroneous, where the court further instructs that "where the negligence of both plaintiff and defendant directly contribute to an injury to plaintiff, the jury must return a verdict for defendant" and "the plaintiff in this case had the right, in the absence of knowledge to the contrary, to assume that the aisle through which she was carrying a bundle of caps was safe and free from dangerous obstructions, yet she was in duty bound to see what was plainly visible to her eyes" and if she stumbled and fell over a board on the floor and was injured and "the location of the board was known to her, or said board was in plain sight, and she either saw it in time to have prevented her fall, or would have so seen it if she had used her eyes as an ordinarily prudent person would do under the same circumstances, then she was negligent, and if such negligence on her part directly contributed to her injury, she cannot recover, even if defendant was also negligent in permitting the board to be in the aisle."

4. ———: Measure of Damages: General Instruction: Reasonable Compensation. An instruction on the amount the jury should allow plaintiff "in assessing her damages," which is correct in its general scope, and directs them "in assessing her damages" to take into consideration the proper elements of injury alleged in the petition, specifically enumerating them, is not erroneous because it does not specifically say that they are to award her such damages as will "reasonably compensate" her for her injuries, where the damages assessed are supported by the evidence and are not excessive; but being correct in its general scope, and specifically limiting her recovery for loss of earnings to such sum as she will "reasonably lose" in the future and her recovery for medical services to such an amount as she has "reasonably incurred," not exceeding the alleged sum, if defendant is not satisfied by its failure to define the term "damages" as "reasonable compensation," it is its duty to request an instruction defining the term. [Approving Jablonowski v. Mod-

ern Cap Mfg. Co., 251 S. W. (Mo. App.) 483, and distinguishing Simmons v. Murray, 209 Mo. App. 248.]

5. **EVIDENCE: Bias of Witness: Impeachment: Relevancy: Insurance Company Conducting Defense: Concealment: Prejudicing Defense.** The intent or bias of a witness with respect to issues on trial, his relation to the parties and the state of his feelings towards them, are never irrelevant or collateral matters, and relevant and material evidence cannot be excluded on the sole ground that its admission may tend to prejudice the jury against one of the parties. An insurance company which defends a suit in the name of a record defendant does not have the right to have that fact concealed from the jury because of possible prejudice that may exist in their minds against such companies. In an action for damages against a manufacturing company for personal injuries received by plaintiff while at work for it, which in fact is being defended by an insurance company, although it is not a party to the record, it is entirely competent to permit plaintiff's counsel, on cross-examination and for the purpose of impeachment, to ask a physician who is testifying for defendant the direct question whether he did not state to her when he came to see her after her injuries were received that he was sent by the insurance company to examine her, and upon his denial to put her on the stand in rebuttal and ask her if he made that specific statement; and such examination cannot be excluded on the sole ground that it will reveal to the jury the fact that the actual defendant is the insurance company and such revelation will tend to prejudice their minds against defendant. But this ruling is made on the basis that the insurance company conducts the defense in the name of the record defendant and produces the witnesses.

Appeal and Error, 3 C. J., Section 754, p. 848, n. 13; 4 C. J., Section 2697, p. 756, n. 25; Section 2951, p. 968, n. 36, 38; Section 3035, p. 1053, n. 16 New. Damages, 17 C. J., Section 1, p. 701, n. 1; Section 7, p. 711, n. 27; Section 443, p. 1112, n. 79. Evidence, 22 C. J., Section 813, p. 725, n. 25. Master and Servant, 39 C. J.; Section 445, p. 322, n. 33; p. 324, n. 36; Section 971, p. 774, n. 95; Section 975, p. 775, n. 16; Section 1038, p. 825, n. 24; Section 1040, p. 827, n. 44; p. 829, n. 58; Section 1071, p. 858, n. 97; p. 855, n. 11; Section 1224, p. 1009, n. 4; Section 1302, p. 1107, n. 4; Section 1411, p. 1230, n. 56; Section 1414, p. 1232, n. 73; p. 1236, n. 85; Section 1426, p. 1246, n. 72; p. 1247, n. 76. Trial, 38 Cyc., p. 1498, n. 22; p. 1784, n. 86. Witnesses, 40 Cyc., p. 2651, n. 85; p. 2652, n. 86; p. 2656, n. 11.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferriss*, Judge.

AFFIRMED.

*Kelley, Starke & Moser* for appellant.

(1)   The court erred in giving plaintiff's Instruction 1, authorizing the jury to find for plaintiff, if defendant or its agents, "placed said board on the floor of said aisle, and negligently failed to remove the same from the floor of said aisle." (a)   Because said instruction fails to state what facts would constitute negligence, or a negligent failure to remove the board from the floor of the aisle, and left it to the jury to determine what constitutes negligence or a negligent failure to remove said board from the aisle.   Senate v. Railroad, 41 Mo. App. 295; Duerst v. Stamping Co., 163 Mo. 607; Hinzeman v. Railroad, 182 Mo. 611; Ravenscraft v. Railroad, 27 Mo. App. 617; Sommers v. Transit Co., 108 Mo. App. 319; Martin v. Railroad, 175 Mo. App. 464; Casey v. Bridge Co., 114 Mo. App. 47.   (b)   Because said instruction authorizes a recovery by plaintiff, if the jury believed, from the evidence, that any agent of the defendant negligently placed said board in the aisle, without further requiring the jury to find that the defendant knew, or by the exercise of ordinary care could have known, that said board was in said aisle, in time, by the exercise of ordinary care, to have removed it before the plaintiff was injured.   Hurst v. Mining Co., 160 Mo. App. 53; Abbott v. Mining Co., 112 Mo. App. 550; Cabanne v. Car Co., 178 Mo. App. 718; Ball v. Neosho, 109 Mo. App. 683.   (2)   The court erred in giving plaintiff's Instruction 2.   Pohlmann v. Car & Foundry Co., 123 Mo. App. 219.   (3)   The court erred in giving Instruction 12 at the request of plaintiff, because said instruction does not require the jury to award such damages as will reasonably compensate the plaintiff for her alleged injuries.   Simmons v. Murray, 234 S. W. 1013; Stephens v. Saunders, 239 S. W. 601; Yarde v. Hines, 238 S. W. 153; Bank of Tulsa v. Daley, 237 S. W. 847.   (4)   The court erred in overruling defendant's motions to discharge the jury because of prejudicial testimony of plaintiff and her witness, Dr. Meyer, in reference to an insurance company. Trent v. Printing Co., 141 Mo. App. 437; Gore v. Brockman, 138 Mo. App. 231; Chambers v. Kennedy, 274 S. W. 726.

*Charles W. Rutledge* for respondent.

(1) Instruction 1, plainly required the jury to find that the shield board was in an aisle in common use; that the plaintiff tripped over it and was injured; that the board in the aisle rendered the aisle not reasonably safe for use; that defendant, or its agents, placed it there and negligently failed to remove it, before plaintiff could recover on that assignment. It contained every constituent element of negligence in failing to provide a safe place to work where the master negligently made the place unsafe. See authorities cited by appellant under Point 1 of its brief. (2) The use of the words, "or its agents," without defining the capacity of the agent, if any error, is harmless where the only agent referred to in the evidence as placing the board in the aisle was the president of the defendant corporation. Stratton v. Nafziger Baking Co., 237 S. W. 538. (3) Instructions 2 and 5 are not inconsistent, nor misleading, but state the law more favorably to defendant than the evidence justified. These instructions, separately and together, state the well-settled doctrine that an employee is not required to anticipate negligence of the master and guard against it, but has a right to assume the master has performed his duty to the servant until the contrary appears while in the exercise of ordinary care. Porter v. Railroad, 71 Mo. 77; Porter v. Railroad, 60 Mo. 162; Waldheir v. Railroad, 87 Mo. 37; Devlin v. Railroad, 87 Mo. 545; Henry v. Railroad, 109 Mo. 488; O'Donnell v. Baum, 38 Mo. App. 245. There was no evidence that plaintiff saw the board, or could see it in plain sight, or otherwise, unless she particularly looked for it, and Instruction 5 was not predicated on any evidence in this respect. State ex rel. v. Ellison, 270 Mo. 645. (4) The omission of the words "reasonable compensation," or their equivalent, in Instruction 12 on the measure of damages, was not reversible error, where the verdict was not excessive. Simmons v. Murray, 209 Mo. App. 248; Chilton v. St. Joseph, 143 Mo. 192. Instructions on the measure of damages, not

containing the words "reasonable compensation," or their equivalent, have been repeatedly approved by the Supreme Court. Wheeler v. Bowles, 163 Mo. 398; Robertson v. Wabash Ry. Co., 152 Mo. 382; Chilton v. St. Joseph, 143 Mo. 199; Lessenden v. Railroad, 238 Mo. 247; Stid v. Railroad, 236 Mo. 382; Browning v. Railway, 124 Mo. 55; McGowan v. St. L. O. & S. Co., 109 Mo. 518; Torreyson v. United Rys. Co., 246 Mo. 55; Mirrielees v. Wabash, 163 Mo. 470; Flaherty v. Transit Co., 207 Mo. 318. (5) The court correctly ruled in refusing to discharge the jury because witnesses testified that one of defendant's witnesses said he was sent to examine plaintiff by an "insurance company" instead of defendant, as he testified. It was competent to impeach such witness; the jury were entitled to know everything affecting the credibility of such witness, the weight to be given his testimony, his interest in the subject-matter, and his contractual relation, friendships or enmities with regard to parties who are to profit or lose by their verdict. The court erred in holding such evidence was not material and in so instructing the jury. Snyder v. Wagner Electric Co., 223 S. W. 911; Meyer v. Mfg. Co., 67 Mo. App. 389; Kinney v. Ry. Co., 261 Mo. 97; Yates v. Wrecking Co., 195 S. W. 551; Muehlebach v. Brewing Co., 242 S. W. 176; Casselman v. Dunfee, 172 N. Y. 507.

RAGLAND, J.—This case was first heard in Division One and an opinion prepared by one of our Commissioners. His statement of the facts and such of his conclusions of law as met with the concurrence of the majority of the Court en Banc follow:

"Action to recover damages for alleged personal injuries. Respondent, on August 6, 1919, the date of her alleged injury, was an employee of appellant in its cap factory in St. Louis. She was employed as a 'cap-sizer,' her work being to sew the right sizes in the caps. This work was done on a sewing machine, placed with other sewing machines on top of a work table at which fourteen girl operators worked, seven on each side of the table.

There were four of these tables in the factory, two tables on each side of a center or main aisle and passageway, some five or six feet wide. Working about these tables in the factory were some forty people, both girls and men, but the machine operators were girls. The sewing machines were operated automatically by means of electric motors connected with the sewing machines by power rods and belts. The power rods ran beneath the tables about ten to twelve inches above the floor. The operators sat upon chairs on both sides of the tables directly in front of the sewing machines. In order to prevent the skirts or clothing of the operators from becoming entangled in the power rods and belting, skirt or shield boards were placed lengthwise on both sides of the tables, the ends of the shield boards fitting or slipping into slots or grooves molded in the iron standards of the tables to keep the boards in position. The shield boards, when in place, were at the feet of the operators and the lower edges some six or eight inches above the floor. They were approximately the same length as the tables. On the opposite side of the floor of the factory from that occupied by the sewing machine tables was a trimming room, denominated by the employees as the 'cage.' When the operators finished their work, they carried the caps in large bundles from the machines to the 'cage,' where they were left and a new allotment of material to be worked upon was obtained from the person in charge of the 'cage.' Respondent worked at or near the south end of a table in the southwest corner of the floor. She completed the work assigned to her a few minutes before noon of the day in question and started to carry her finished work, about fifteen or eighteen dozen caps, weighing between twenty and twenty-five pounds, in her arms to the 'cage,' or finishing room, on the opposite side of the floor. Respondent testified that she walked around the south end of the table to the main or center aisle, and as she reached a point in the aisle about opposite her machine and immediately behind the chair of the operator directly across the table from her, she tripped on a shield board lying across the center of

the main aisle, and fell, striking her right knee on the edge of the board and her right hand upon the floor. She was assisted to her feet by another girl operator and, becoming nauseated, went to the rest room, where she examined her knee and found it to be red and 'the skin was all rubbed.' After lunch, she attempted to resume work, but, after working twenty minutes, her knee became painful and started to swell, causing her to leave her work and return home. Respondent had been in appellant's employ for about six months. She testified that it was customary for her and the other operators to use the main aisle in carrying their completed work to the finishing room; that the bundle of caps which she was carrying at the time extended from her waist-line as high as her chin, so that she could not see the shield board and did not know it was lying across the aisle at the time; that 'this board came from underneath the machine on the east side. The board was underneath the first machine from the Washington Avenue side. I seen Mr. Novoson (president and manager of appellant corporation) at that machine quite often, but I seen him the night before I fell. He was fixing the motor on the back there, on the left side. The motor was on the Washington Avenue side, on the south side. I did not see Mr. Novoson do anything with this board at any time, only when he was fixing the motor he had to take it out. It was quitting time, 5:30, the night before; my attention was attracted to him because the motor during the day was sparkling and it was making noise. I was going home. I just says, ''Good night'' to Mr. Novoson. I saw the board that night; it was either behind or alongside. I couldn't exactly tell you. His feet were out in the aisle. His head and hands were underneath the machine, underneath the table, and I saw the board in about where his feet were, somewhere along there. This accident happened a quarter to twelve the next day. I did not use that aisle that day before I was hurt. I used the west aisle, that is, the aisle up along the Tenth Street side. Before that, I had seen the board out of this machine either three weeks before or two weeks before I fell.

It was in the same aisle, in the main aisle; about twice a week or three times a week he had to fix it.'

"Respondent claims to have gone to the office of her physician for treatment of her knee every day or every other day for a period of about two weeks after the date of her injury, walking to his office and back home. The doctor's office was about a block, or perhaps two blocks, from her home. Thereafter her physician called at her home, where she was confined for a period of four or five weeks. On October 14, 1919, an X-ray photograph of her knee was taken, after which her knee was bandaged and bound with adhesive tape for a considerable period of time and she was still under the care and treatment of her physician at the time of the trial in November, 1920. Respondent complained of nervousness, insomnia, loss of appetite and pain in and about her knee and walked with the aid of a cane. Another X-ray photograph was taken on April 20, 1920.

"Two girl operators employed in the factory testified to having seen a shield board lying across the main aisle at times previous to the day of respondent's alleged injury. Another operator, Beatrice Hart, testified that she was sitting at her machine at the time respondent fell; she didn't see, but heard, her fall, and witness turned around in her chair and respondent was on the floor back of witness's chair; the shield board was lying in the aisle back of the chair. She testified: 'I noticed the shield board; it didn't fit in there; the table sat on some iron legs and on those legs they had little slot places where the shield board was supposed to fit in, but the shield board was a little too short, and it didn't fit them; it always hung on this end, and the other end was always on the floor. It was always on the floor; it never fit in there. The shield board was lying in the aisle. It would fall out of there and get into the aisle. I noticed it several times in the aisle, but not every day I didn't see it there, but a number of times. It was lying around on the floor for two or three weeks before the plaintiff fell, before the accident, out in the aisle and under the machine. . . . I came in contact with one

of these shield boards myself just a few days before Miss Stella fell; the shield board was lying there in the middle aisle, and I stumbled over it myself; I didn't fall, but I stumbled over the board.' Witness viewed respondent's knee after lunch and said, 'It was just turning a little red; I said it looked red and blue; it was turning blue.'

"A. J. Novoson testified that he was president, general superintendent and manager of appellant corporation and denied having worked on the motor referred to by respondent on the day before the mishap or for several days before that time; denied there were any shield boards in the aisle and said neither respondent nor Miss Hart had ever complained to him about any board lying in the center aisle; that he never saw a shield board that was too short, or one that would not fit; that the shield boards will not slip out of place unless some one pulls them out; that appellant's porter swept the aisles every afternoon and evening and, if anything happened respecting a shield board, the employees 'would always call the porter or somebody to put it in; they wouldn't come to me.'

"Appellant's porter testified that he swept the floor once a day in the afternoon, beginning about 3:30 o'clock and requiring about two hours to finish the sweeping; that he never saw any shield boards lying around in the aisles, nor did he leave them there; he was not sure that he was working on August 5, 1919, the day before respondent fell, but supposed he was.

"There was a sharp conflict in the medical testimony respecting whether respondent suffered any real or substantial injury to her knee. Respondent's physician testified that, when first attending her, he found a bad contusion, a bruised condition of the entire surface of the knee; that subsequently the knee became inflamed and respondent complained of such severe pain in her knee that, suspecting further trouble, he had an X-ray plate taken on October 14, which disclosed a fracture of the inner articular surface of the condyle of the knee pan, which caused an inflammatory condition of the knee; that

such a fracture causes an exudation of synovial fluid in the knee joint and an inflammation of the synovial membrance, known as synovitis, which is naturally followed by an osseous or bony growth of a callous nature, the effect of which is a permanent disability to the normal functioning of the knee joint. The physician testified he always found respondent walking with a cane, complaining of pain in the knee joint; he also found some swelling at times and observed that respondent walked with a limp.

"The X-ray specialist who photographed the knee testified that he had not examined respondent as a surgeon, but that the photographic plates show a partial fracture of the articular surfaces of the femur; a roughening of the articular surface at the knee joint, which causes an inflammatory condition and irritation. Witness believed 'there is a certain amount of permanent injury' to the knee.

"Three physicians testified for appellant, two of them having been appointed by the trial court to make an examination of respondent. All three testified that there was no permanent injury to the knee; that they could find no fracture or similar abnormality about the knee that would cause respondent pain or to limp, although they all admitted that the X-ray plates in evidence showed a slight irregularity or roughening of the internal condyle.

"The petition charged appellant with negligence in these respects: First, in negligently permitting said shield board to be or remain in said aisle or passageway provided for the use of employees in the factory; second, in negligently failing to keep said aisle clear and free from obstructions to the free and safe use of same by defendant's employees; third, in failing to use reasonable care in keeping said shield board safely and securely fastened to the sewing machine table, thereby negligently allowing it to become loose and get out of its proper place and into said aisle; fourth, in removing said board and placing same in the aisle or passageway used by employees and in failing to replace same in its

proper position in said table; and fifth, in negligently failing to exercise ordinary care to provide plaintiff with a reasonably safe place to work. The third charge of negligence, however, was withdrawn from the jury by the trial court, because that charge was not supported by the evidence.

"The answer was a general denial, with the further plea that respondent's injuries, if any, were caused by her contributory negligence in that 'if, on the occasion mentioned in said petition, the shield board was in the aisle or passageway therein mentioned, said shield board was plainly visible and obvious to plaintiff, and the location and position of said shield board was known to plaintiff, or by the exercise of ordinary care on her part would have been known to her; but defendant avers that, on and prior to said occasion, plaintiff negligently failed and omitted to look where she was walking or stepping, negligently failed and omitted to guard her footsteps, and negligently caused and permitted one of her feet to come in contact with said shield board.'

"The reply was a general denial of the new matter of the answer.

"The trial resulted in a verdict and judgment for plaintiff for $5,000. Defendant appealed to the St. Louis Court of Appeals, where the judgment below was affirmed (251 S. W. 477), but that court, deeming its decision to be contrary to the decision of the Kansas City Court of Appeals in Simmons v. Murray, 209 Mo. App. 248, certified the cause to this court for final adjudication.

"I. Appellant assigns error in the giving of plaintiff's instruction numbered 1, which charged the jury on plaintiff's theory of recovery. That instruction authorized a verdict and finding for plaintiff if the jury found and believed, among other essential facts, 'that the defendant, or its agents, placed said board on the floor of said aisle, and negligently failed to remove same from the floor of said aisle.' It is urged by appellant that said in-

What Acts Constitute Negligence.

struction fails to state what facts constitute a negligent failure to remove the board from the floor of the aisle, but left it to the jury to determine what constitutes neg- ligence in failing to remove said board from the aisle. This instruction must be read in connection with plain- tiff's given instruction numbered 7, as follows: 'The word "negligence" or "negligently" as used in these instructions, means the failure to use ordinary care, and the term "ordinary care" means such care and diligence as a reasonably prudent person would use under the same or similar circumstances.' Plaintiff's Instruction 1 fur- ther required the jury to find and believe that plaintiff tripped over a shield board and fell to the floor and was injured; that said board was lying on the floor of an aisle or passageway in defendant's factory, provided by defendant and in common use by its employees in the performance of their duties; and that such aisle or pas- sageway, with said board lying in same, if they so found, was not reasonably safe for the use of defendant's em- ployees in the performance of their duties. We think the instruction, in its entirety, contained the essential ele- ments of the specific charges of negligence alleged in plaintiff's petition and was supported by the evidence, and, when read in connection with plaintiff's instruction numbered 7, defining the terms 'negligently' and 'ordi- nary care,' it is not subject to the criticism which ap- pellant makes against it.

"Appellant says the instruction is bad for a further reason, i. e., it authorized recovery by plaintiff if the jury believed that *any agent* of defendant placed said board in the aisle and negligently failed to remove it, without requiring the jury to find that defend- ant knew, or by the exercise of ordinary care could have known, that said board was in said aisle in time, by exercise of ordinary care, to have removed it before plaintiff was injured. Appellant argues that the jury might have held it liable under this instruction, if they believed that a porter, bundle boy, stenographer or other mere employee had placed the board in the aisle, notwithstanding the jury

Act of Defendant or Agents: Knowledge.

might also have believed that the board had been placed in the aisle so shortly before the alleged injury that the defendant itself had neither knowledge thereof nor reasonable time to remove it. The proof, however, tends to show that Mr. Novoson, president and general manager of appellant corporation, and who was, of course its *alter ego,* and hence, its vice-principal and agent, had removed the shield board on the night before respondent's alleged injury while working upon the motor, and had then placed it in the aisle. At least, there is no evidence that any other agent or employee had placed the shield board in the aisle. If the jury believed that Novoson, the *alter ego* and vice-principal of appellant, placed the board in the aisle (which it might well have done under the evidence), then his act was the act of defendant and it had actual knowledge thereof. A somewhat similar instruction was under consideration in Stratton v. Nafziger Baking Co., 237 S. W. (Mo. App.) 538, reading, 'if you believe from the evidence that defendant, *by and through its agents,* knew that said floor and ceiling was in imminent danger of falling,' etc. It was claimed the instruction was bad because it declared, or assumed, that the knowledge of the 'agents' is the knowledge of the master, without reference to the capacity of the agents' employment. It was there held that, inasmuch as the evidence was uncontradicted that defendant's manager or vice-principal knew and appreciated the danger, defendant's knowledge at the time might well have been left out of the instruction, for knowledge of the vice-principal was necessarily the knowledge of the master. But the instruction in this case goes further and reads 'or, if you find defendant or its agents negligently permitted said board to be or remain in said aisle after the defendant or its agents saw, or by the exercise of reasonable care and diligence, could have seen or discovered the said board in said aisle in time to have removed it before the plaintiff was tripped by same and injured, if you so find, and that either of such acts of negligence, if any, was the cause of plaintiff being injured, if you so find,' etc. We think the question of defendant's knowledge of the shield

board in the aisle and its opportunity to have removed it were properly submitted by plaintiff's instruction numbered 1, and the assignment is ruled against appellant.

"II.    Appellant assigns error in the giving of plaintiff's instruction numbered 2, as follows: 'You are instructed that it was the defendant's duty to use ordinary care and diligence to discover and remove unsafe or dangerous obstructions, if any, in the aisles and passageways provided for use of its employees in performing their work, and that the plaintiff was not required to look for obstructions in such aisles before using same, but was only required to use the ordinary care that a reasonably prudent person would use in the same or a similar situation in walking in said aisles.' Appellant contends that the exercise of ordinary care on respondent's part in law required her to use her sense of sight and to look for obstructions in the aisles, especially in view of the fact that she testified to having seen the shield board in the aisle on occasions before the day she tripped and fell.    Hence, it is contended that plaintiff's Instruction 2, in telling the jury that plaintiff was not required to look for obstructions in the aisles before using them, eliminated a necessary element of ordinary care on her part and thereby required of plaintiff the use of a lesser degree of care than ordinary care.

"The trial court, of its own motion, gave Instruction 5, reading: 'It is the law that where the negligence of both plaintiff and defendant directly contribute to an injury to plaintiff, the jury should return a verdict for defendant.    The plaintiff in this case had the right, in the absence of knowledge to the contrary, to assume that the aisle through which she was carrying a bundle of caps was safe and free from dangerous obstructions, yet she was in duty bound to see what was plainly visible to her eyes.    If, therefore, you find from the evidence that plaintiff stumbled and fell over a board on the floor of said aisle and was injured, and if you further find that the location of the board on the floor

*Unsafe Place: Negligent Use.*

was known to plaintiff, or that said board was in plain sight, and that she either saw it in time to have prevented her fall, or would have so seen it if she used her eyes as an ordinarily prudent person would do under the same circumstances, then she was negligent, and if such negligence on her part directly contributed to her injury, she cannot recover, even if you find that the defendant was also negligent in permitting the board to be or remain upon the floor.'

''When the two instructions are read together, we think they are not confusing, but correctly declare the rule of law, heretofore announced by this court, that, where the risk or danger is so plainly obvious or apparent to the servant that an ordinarily prudent person under the same or similar circumstances would have seen and appreciated the danger of injury, then the servant is guilty of contributory negligence, or, under certain circumstances, assumes the risk of injury. [Conroy v. Vulcan Iron Works, 62 Mo. l. c. 39; Thorpe v. Railway Co., 89 Mo. 650; Williams v. Pryor, 272 Mo. 613.] When, in plaintiff's instruction numbered 2, the trial court charged the jury that it was defendant's duty to use ordinary care to discover and remove unsafe or dangerous obstructions, if any, in the aisles provided for the use of its employees, it was tantamount to telling the jury that it was the master's duty to furnish and provide the servant with a reasonably safe place in which to work. The master is always held to the faithful performance of that duty, which is non-delegable. [Williams v. Pryor, supra.] We think the Court of Appeals was right when it said in its opinion in the instant case (251 S. W. l. c. 482): 'These instructions, when read together, announce the well-settled rule that an employee is not required to anticipate negligence of the master, but has the right to assume that the master has performed his duty to the servant until the contrary appears to the servant while in the exercise of ordinary care.' The evidence in the record before us is well-nigh conclusive that plaintiff did not see the board and could not have seen it because of the bundle of caps she was

carrying, which extended from her waist to her chin. The board was lying in the aisle, almost, if not precisely, at the extreme south end of the table, and the evidence is to the effect that plaintiff stumbled over it immediately upon passing around the end of the table while her vision of the floor was obscured by the bundle of caps she was carrying. As remarked by the Court of Appeals in its opinion, supra, plaintiff could only have discovered the danger and presence of the board by laying down the bundle of caps or by first making an inspection of the aisle before carrying the bundle to the trimming room. The law does not place that onerous a duty upon her, but only required of her that degree of care which an ordinarily prudent person would have used under the same circumstances. We see no reversible error in the giving of plaintiff's Instruction Number 2, and that assignment is ruled against appellant.

"III. Appellant complains of the giving of plaintiff's instruction numbered 12 on the measure of damages, which reads: 'If you find for the plaintiff, you will, in assessing her damages, take into consideration the physical condition of the plaintiff immediately before and since receiving the injuries on account of which she sues, and the extent of the plaintiff's injuries, so far as you find they have been shown by the evidence; the physical pain and mental anguish suffered by the plaintiff at the time and since her injuries, if any, as shown by the evidence; the physical pain and mental anguish you believe from the evidence the plaintiff will suffer in the future, in consequence of her injuries, if any; her loss of earnings, if any, in consequence of her injuries, to the date of filing her amended petition on May 10, 1920, at a rate not to exceed $18 a week, and not exceeding the sum of $792; any earnings, in consequence of her injuries, which you find she has lost since May 10, 1920, and any loss of earnings which you believe from the evidence she will reasonably lose in the future in consequence of her injuries, if any; and if you further

*Measure of Damages: Reasonable Compensation.*

find the plaintiff has incurred indebtedness for medical services and medicines in the treatment of her injuries, if any, you should award her such sum for same as you find plaintiff has reasonably incurred, not exceeding $300.' It is urged that this instruction does not require the jury to award such damages as will *reasonably compensate* the plaintiff for her alleged injuries, and, therefore, it places no limit on the amount of damages the jury may find; in other words, that the jury were not given any legal guide or rule to follow in assessing plaintiff's damages. Appellant bottoms its contention upon the decision of the Kansas City Court of Appeals in Simmons v. Murray, 209 Mo. App. 248, and it is because of alleged conflict with that decision that the St. Louis Court of Appeals certified this cause to this court for our ruling and adjudication. In the Simmons case the instruction read: 'The court instructs the jury that if you find the issues for the plaintiff under the evidence and the instructions of the court, you may in assessing plaintiff's damages, if any, take into consideration the physical pain and mental anguish, if any, which you believe and find from the evidence plaintiff has suffered as a direct result of his injuries, if any, and you may also take into consideration the nature and extent of plaintiff's injuries, if any, and whether or not any of said injuries, if any, are permanent. You are further instructed that if you find for the plaintiff you may take into consideration in assessing his damages, his lost time and wages, if any, and doctor bills, if any, necessarily incurred in connection with the treatment of his finger, which you may find to be shown by the evidence in the case.' The Kansas City Court of Appeals held the giving of the foregoing instruction amounted to a misdirection of the jury, rather than mere nondirection. As bearing upon the ruling of the Kansas City Court of Appeals in that case, it is to be noted that the trial jury returned a verdict of $3,000 for plaintiff and the trial court required plaintiff to file a *remittitur* of $1,000, and, in discussing the question, the Court of Appeals there remarked: 'As to the a-

mount of damages recoverable, the court improperly instructed the jury, because the instructions permit the jury, if it sees fit, to allow more than a reasonable sum to compensate plaintiff for his injuries, and *the jury proceeded to allow an excessive amount.*' (Italics ours.) So that it is apparent that the ruling of the Kansas City Court of Appeals in that case is predicated upon the excessive verdict below as indicative of what that court believed to be the harmful and material vice of the instruction there under consideration.

''But a critical examination of the instruction in the instant case discloses that the jury were limited in assessing plaintiff's damages to any loss of earnings which they believed from the evidence 'she will *reasonably* lose in the future in consequence of her injuries, if any;' and to such indebtedness for medical services and medicines in the treatment of her injuries, if any, as they found 'plaintiff has *reasonably* incurred, not exceeding $300.' Furthermore, the instruction limited the jury to an assessment for loss of plaintiff's earnings prior to filing her amended petition on May 10, 1920, 'at a rate not to exceed $18 a week, and not exceeding the sum of $792.' Plaintiff's amended petition filed on May 10, 1920, alleged that she had then incurred for medical attention and medicines the sum of $300 and she had then lost earnings as a cap-maker for a period of forty-four weeks at the rate of $18 per week, amounting to $792. The proof shows the reasonable value of medical services incurred by plaintiff at the time of trial was $351.75; that, at the time plaintiff was injured, she was getting $14 per week, and that shortly afterward, in September, 1919, the wage of cap-sizers was increased to $19 per week, and after about a month, there was an increase in wage to $25 per week and at the time of trial in November, 1920, cap-sizers were being paid $27 per week. So, as respecting the elements of lost earnings and indebtedness incurred for medical services, plaintiff's instruction limited the jury to the respective amounts asked and alleged in her petition and supported by the proof. Plaintiff in her petition alleged she was damaged in the

aggregate sum of $15,000 and prayed judgment for that amount. The jury by their verdict allowed her $5,000, which sum neither the trial court nor the St. Louis Court of Appeals deemed excessive, and which we do not find to be excessive, if respondent suffered the injuries of which she complains and testified.

"Did then the giving of plaintiff's Instruction 12 constitute reversible error under all the facts and circumstances of this case? In Browning v. Railroad, 124 Mo. l. c. 71, we said: 'The instruction on the measure of damages is also assailed as error. The instruction was in these words: "If the jury find for the plaintiff they will assess her damages at such sum as in their judgment will be a fair and just compensation to her for the loss of her husband, not exceeding the sum of $5,000." The defendant asked no instruction on the measure of damages whatever. No attempt was made by it to point out the proper elements of damage in such cases or to modify the general language of the instruction. The instruction is not erroneous in its general scope; and if, in the opinion of counsel for defendant, it was likely to be misunderstood by the jury, it was the duty of the counsel to ask the modifications and explanations, in an instruction embodying its views. The court is not required in a civil case to instruct on all questions, whether suggested or not, and as there is nothing in the amount of the verdict to indicate that the jury were actuated by any improper motive in their assessment, the general nature of the instruction is no ground for reversal.'

"In Robertson v. Railroad Company, 152 Mo. 382, the instruction under review read: '3. If the jury find for the plaintiff they will assess her damages at such sum, not exceeding $5,000, as they may believe from the evidence she has sustained by reason of the injuries to her foot and ankle resulting from the injuries complained of. And in assessing her damages the jury may take into consideration any evidence in the case as to any pain and suffering resulting from said injuries and any evidence as to the character and extent of such injury

and any evidence as to any expense she has necessarily incurred in being treated for said injuries.' We there said: 'Plaintiff's third instruction is also criticised upon the ground that it furnished the jury no guide by which to estimate the damages plaintiff was entitled to recover in the event of their finding for her; besides, it authorized a recovery for medical expenses when none were proven. We see no objection to the instruction except that part of it which authorized a recovery for medical expenses. .. . . With this exception, the instruction is good as far as it goes, and if defendant desired to restrict plaintiff's right to the damages that she was entitled to recover to more limited bounds than was done by the instruction it should have asked an instruction to that effect. [Browning v. Railroad, 124 Mo. 55; Matthews v. Railroad, 142 Mo. 645; Barth v. Street Ry., 142 Mo. 535.]'

"In Boettger v. Iron Co., 124 Mo. l. c. 105, we said: 'The generality of the instruction upon the measure of damages is also objected to, but as it is evident from the amount of the verdict that the defendant suffered no injury by reason thereof, the judgment ought not to be reversed on this account. If counsel for defendant desired a more definite instruction on the measure of damages they should have asked for it.' In that case, the jury were instructed to allow plaintiff 'such damages, not exceeding $5,000, as you may deem fair and just under the evidence in the case, with reference to the necessary injury resulting to her from the death of her husband.'

"And an instruction on measure of damages much more general in form than the one now under review was approved in Wheeler v. Bowles, 163 Mo. 398.

"In Shinn v. United Railways Co., 248 Mo. 173, an instruction on the measure of damages was claimed to have constituted reversible error because of its looseness in language and generality of terms. Lamm, J., delivering the opinion of this court, there said: 'We will not speculate on what the jury *might* do, or airly conjecture this or that. We stand on the proposition that the jury

are presumed, absent anything to the contrary appearing, to obey their oaths and bring in a verdict according to the evidence. Being men of sense and acting under an oath freshly taken, they are entitled to that presumption.'

"The St. Louis Court of Appeals in their opinion in the instant case (251 S. W. l. c. 483) say: 'The instruction now under consideration certainly was good as far as it went. Now it was the duty of defendant's counsel to ask the trial court to limit the measure of damages if it was so desired, and, unless the court refused to so limit the measure of damages, there is no error committed by that court if the instruction given is good in its general scope. Thus we have a mere nondirection which is no ground of error in this court. This instruction, after all, left to the jury to find the amount plaintiff should recover for the loss from the injury complained of in the petition and as supported by the evidence. Presumably, at least, there was a jury of twelve sensible men, who understood that this was a lawsuit to recover just compensation for injuries which plaintiff received through the alleged negligence of the defendant. It was a suit to recover damages, which is a pecuniary compensation or recompense for the injury sustained. Is it fair to say that because of the failure to use the words "reasonable compensation" the jury gave a higher verdict than justice demanded, or higher than they would have given if such phrase had been used in the instruction? The defendant had an opportunity to constrict the measure of damages in the proper limits by its own instruction, and has failed to do so.'

"We are inclined to the view expressed by the St. Louis Court of Appeals herein. The trial jury knew that they were the triers of a lawsuit and that one of their functions and duties, as such, if they found for plaintiff, was to 'assess her damages,' for the instruction so charged them. It is only by use of the most hypercritical reasoning and analysis that the instruction may be said to be deficient in any respect. Webster's New International Dictionary defines the word 'damages' as

'the estimated reparation in money for detriment or injury sustained; compensation or satisfaction imposed by law for a wrong or injury caused by the violation of a legal right.' The terms 'reparation' and 'compensation,' as commonly understood, carry with them the idea of 'making whole,' or giving an equivalent or substitute of equal value. So when the jury are instructed to assess 'damages,' then under the ordinary definition and commonly accepted meaning of that word, they must necessarily be presumed to know that they are to award the litigant reparation or compensation; in other words, their verdict should make the litigant whole. We fail to see where there can be any comparative degrees of reparation or compensation, whether denominated 'reasonable' or 'unreasonable.' In other words, reparation is but reparation, nothing more and nothing less, and compensation is but compensation. If, by the jury's verdict, the amount of damages assessed is either more or less than compensation, both trial and appellate courts have the inherent power to correct the error in judgment of the jury. But, whether right or wrong in this conclusion, it is clear to our minds that there was no *misdirection* of the jury by plaintiff's instruction, for while it permitted an assessment of her 'damages,' it limited the jury to a consideration of proper elements of damage alleged in the petition and supported by the proof. If appellant was not satisfied with the scope of the instruction, because of its failure to define the term 'damages' used therein, then it should have submitted an instruction defining that term. It did not see fit to do so and should not be heard to complain now. We see no reversible error in the giving of the instruction on the measure of damages under the facts and circumstances of this case.

"IV. Appellant assigns error in the overruling of its motions to discharge the jury because of certain alleged prejudicial answers of plaintiff and her physician with reference to one of defendant's witnesses, a physician, having been employed in this action by an insurance company. The matter in question arose at the trial in this way: Plaintiff was examined on two separate oc-

casions by a Dr. Kinder, who testified as a witness for defendant at the trial respecting the conclusions he arrived at as a result of his two examinations. On one of these occasions, Dr. Kinder made an examination of plaintiff's knee in the presence of plaintiff's physician and later the two physicians examined the X-ray photographs taken of plaintiff's knee. Upon re-direct examination of plaintiff's physician, testifying on behalf of plaintiff, this occurred:

"'Q. How did you get in touch with Dr. Kinder? A. Dr. Kinder was sent there by the insurance company; that is, I so understood it.

"'MR. KELLEY: I move that the jury be discharged, because he didn't understand any such thing, and that answer was made by a wilful witness, one intended to prejudice this defendant before the jury, and done with premeditation, and for the purpose of substituting the defendant in this case.

"'MR. RUTLEDGE: I consent to the answer being stricken out.

"'MR. KELLEY: Oh, no; I move that the jury be discharged.

"'THE COURT: What was Dr. Kinder's relation to the case?

"'MR. KELLEY: He went there for the defendant to examine her, and this witness sits here and blurts out this purposely.'

"'The trial court thereupon sustained the objection to both question and answer, but refused to discharge the jury.

"Plaintiff, on re-direct examination upon her case in chief, testified: 'I really cannot exactly remember when was the first time Dr. Kinder came to see me, or how long it was after I was injured. Q. Do you know how he came to see you? (Objection overruled). A. He just came and knocked at the door and he just said that he was the *company* doctor, that is all he said.' (Italics ours).

"Dr. Kinder thereafter testified for defendant. Direct examination: 'I went to the plaintiff's home and

stated to the plaintiff that I had been requested by the Modern Cap Company (defendant) to come and see her, and to ascertain her physical condition, and she told me that she had had an accident there.' Cross-examination: 'The first time I went to see Miss Jablonowski I went at the request of an attorney by the name of Mr. Pardee, who told me he represented the Modern Cap Company. . . . I told her who I was and what I represented, what my business was, and that I represented the Modern Cap Company, and they wanted me to make an examination of that injury.'

"'Plaintiff was again called as a witness in rebuttal and on direct examination testified:

" 'Q.   I will ask you if Dr. Kinder told you that he came from the defendant? ·

" 'Mr. Kelley: I object to that as wholly immaterial.

" 'Q.   (continuing): Or at the request of the defendant?

" 'Mr. Kelley: It doesn't make any difference one way or the other, what he told her.

" 'The Court: She may answer.    ·

" 'A.   Yes, sir; he did.

" 'Q.   What did he say?   A.   He said he was from the insurance company, a doctor from the insurance company.

" 'Mr. Kelley:   I again move that the jury be discharged, because that was done deliberately, done for the purpose of biasing and prejudicing the jury, and I move that the jury be discharged.

" 'The Court:   One moment, please; I say, you asked her a general question as to what was said, not limiting it to the point that you are seeking to rebut, but it is a question which would enable her to make a state · ment here which is highly and grossly improper before this jury, and she must have known that it was improper. I don't accuse you of suggesting it to her at all, because, of course, you know it is improper, and it is a very serious question whether I ought not to discharge the jury here on that account. You know perfectly well that wheth-

er a case is being defended by an insurance company or not is a matter that the jury has no right to take into consideration at all; it is not a question—that fact does not appear; there is nothing here to show that this case is being defended by an insurance company, and, even if it were, it wouldn't make any difference, as far as the rights of the party are concerned; we have been trying this case three days; I don't think I ought to discharge the jury; I think the jury is intelligent enough—

" 'Mr. Rutledge: I am willing that the answer be withdrawn; I want to say, in answer to your Honor, to what your Honor has said, the question was made with the intention of rebutting what Dr. Kinder said with regard to his employment.

" 'Mr. Kelley: Your Honor, we further object to it, and in answer to what he has just said I want to call your attention to the fact that on direct examination this plaintiff was asked for all the conversation she had with Dr. Kinder the first time that he came there and nothing like that was said, and now, in order to prejudice and bias this jury, and for the purpose of preventing us from a fair and impartial trial, that answer came in before I could object, was given here, not properly in rebuttal; the question wasn't proper to begin with, because it didn't rebut anything, and now in view of the discussion that has taken place between you and counsel, and in justice and fairness to the defendant and its rights, I again renew my motion to discharge this jury.

" 'The Court: I think I have explained my ruling.'

"Whereupon the court denied defendant's second motion to discharge the jury."

It will be noted that in none of the vigorous protests made by defendant's counsel in the court below with respect to disclosures that would carry an implication that an insurance company was conducting the defense was there any denial of that fact. Nor has there been any such disclaimer in brief or argument here. The contention must be then that an insurance company in defending in the name of the record defendant in cases of this

character has the unqualified right to have that fact concealed because of the possible prejudice that may exist in the minds of juries against such companies.

It is elementary that relevant and material evidence cannot be excluded solely on the ground that it may tend to prejudice the jury against one of the parties. If, therefore, the testimony of plaintiff that the witness Kinder stated to her that he had been sent to examine her by the insurance company gives appellant any just cause of complaint it is because that testimony was not relevant and competent for any purpose of the case. Touching the question of whether such testimony was irrelevant or collateral the language of this court in passing upon a situation very like that disclosed by the record in this case is apropos:

"It is not suggested, either by brief or in oral argument of counsel, that a casualty insurance company is not taking the burden of the defense of this case, as it has the perfect right to do. It has not only the right, but the obligation often rests upon it to protect its stockholders against wrongful claims in all legitimate ways, and the defense of suits not founded in honest liability is one of those ways; but in the trial of such cases upon the merits the jury is entitled to know everything that affects the credibility of witnesses and the weight to be given their testimony, including their interest not only in the subject-matter, but in the parties who are to profit or lose by the verdict. This goes not only to contractual relations with reference to the subject-matter of their testimony, but to their friendships and enmities. . . .

"When Mr. Bowser testified plaintiff had the right to ask him if he was not an employee of the defendant, and for the same reason and for the same purpose had the right to ask him if he was not there for the insurance company which produced him. For the same reason plaintiff had the right to ask Dr. Schreck if he was not the paid agent of the insurance company with respect to the subject of his testimony. The case as it is presented in this record could not have been honestly placed before the jury without the disclosure of the relation which

these witnesses sustained to the company." [Snyder v. Wagner Elec. Mfg. Co., 284 Mo. 285, 310, 311, 312.]

In other words the interest or bias of a witness with respect to the issues on trial, his relation to the parties and the state of his feelings toward them are never irrelevant or collateral matters. [State v. Mulhall, 199 Mo. 202, 212; 28 R. C. L. 614, 615.]

The witness, Dr. Kinder, having testified that he told plaintiff he represented the Modern Cap Manufacturing Company and was sent by it to examine her, it was clearly competent for plaintiff's counsel on cross-examination, for the purpose of impeachment, to have asked him the direct question whether he had not stated that "he was from the insurance company, a doctor from the insurance company," and upon his denial to have placed plaintiff on the stand and asked her whether Kinder had made that specific statement. The testimony as elicited served precisely the same purpose. The fact that the usual foundation for that method of impeachment had not been laid was waived by defendant when it based its objection on the ground that what Dr. Kinder told her was "wholly immaterial." And in any event the appellant could not have been prejudiced by the mere failure of plaintiff to follow formal procedure in her efforts to impeach the testimony of one of its witnesses.

The assumption that plaintiff's counsel in bringing out the testimony complained of was acting in good faith must be indulged on the record before us, and our ruling herein is made on that basis. If the case were one in which it appeared that an insurance company had not in fact conducted the defense in the name of the record defendant and produced the witnesses and that questions had been propounded to witnesses with respect to their relations to such a mythical defendant, in bad faith and for the purpose of prejudicing the jury, a different situation would confront us.

The record as a whole disclosing no reversible error the judgment is affirmed. *Otto, Atwood, White* and *Walker, JJ.,* concur; *Blair, C. J.,* dissents as to Paragraph IV and result; *Graves, J.,* not sitting.