STATE of Missouri, Plaintiff–
Respondent,

v.

James J. ATKINSON, Defendant–
Appellant.

No. 17676.

Missouri Court of Appeals,
Southern District,
Division One.

June 30, 1992.

Motion for Rehearing or Transfer
Denied July 22, 1992.

Application to Transfer Denied
Sept. 22, 1992.

Timothy R. Cisar, Lake Ozark, for defendant-appellant.

William L. Webster, Atty. Gen., Robert Alan Kelly, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SHRUM, Judge.

The defendant was found guilty by a jury of the class D felony of unlawful use of a weapon and sentenced to one year in the county jail. The court suspended execution of the sentence and placed the defendant on supervised probation for five years. Because we conclude the trial court committed reversible error when it permitted the state to cross-examine a defense witness about earlier unrelated adult abuse charges lodged by the witness against the defendant, we reverse and remand for a new trial.

## FACTS

The victim, Denzil Blair, lived on a Camden County farm where he raised cattle. The defendant, who lived on an adjoining farm, owned two Rottweiler dogs which began attacking and, on occasion, killing Blair's calves. The problem was ongoing. Finally the defendant gave Blair permission to shoot the dogs if they attacked his cattle again.

On March 31, 1990, upon seeing the dogs again attacking his cattle, Blair shot the dogs. Then, as Blair walked back toward his house, the defendant crossed the fence and approached Blair, shouting obscenities along the way. Blair testified that the defendant walked up to him and grabbed the gun, that they had "a brief tussle" over the gun, and that the defendant yanked the gun from Blair and "stuffed it" into Blair's belly, holding it there momentarily. The defendant then took the gun and beat it apart over a tree trunk. Based on the foregoing, the defendant was charged with the class D felony of unlawful use of a weapon in violation of § 571.030.[1]

At trial, the defendant's living companion, Ginger Sharp, was called as his witness. Her testimony and that of another witness, Delbert Ingels, closely tracked the defendant's testimony: Blair shot one of the dogs while it was on the defendant's property; Blair pointed the shotgun at the defendant's stomach as the defendant approached him; the defendant took the shotgun from Blair but did not point it at Blair; the defendant unloaded the gun and then broke it apart by hitting it against a tree.

By cross-examination the state elicited from Sharp that she had lived with the defendant six or seven years, she had two children by him, she and the defendant had talked about marriage "a lot," they had separated only for very short periods of time, she was "very close" to the defendant, she did not want to see him get in trouble or go to the penitentiary because "[h]e was not wrong," and that the defendant supported her and her children.

---

1. § 571.030, RSMo 1986, provides, "1. A person commits the crime of unlawful use of weapons if he knowingly ... (4) Exhibits, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner...."

Sharp denied that the defendant told her what to say about the incident, that she had compared stories with the defendant or Ingels as they wrote out their statements about the incident, that she felt threatened if she didn't "follow his story," and that the defendant had threatened her if she did not corroborate his version of the incident.

Over timely objections by the defendant the following evidence, offered by the state, was placed before the jury. The state elicited from Sharp that before the dog-killing incident she had been the object of a "violent, angry outburst" by the defendant, that she had filed two adult abuse actions against the defendant, and that in January 1990 she had filed a verified petition for an order of protection in an adult abuse case. That petition was admitted into evidence. By the petition, Sharp had charged that the defendant caused her physical harm, attempted to physically harm her, placed her in apprehension of immediate physical harm, harassed her, and unlawfully imprisoned her. In the petition, Sharp specifically alleged that the defendant "hit her with his fist," "tore my car up so I could not leave," "tore phone out of the wall so I could not call for help," "threatened me," and "harassed me."

When the jury returned their verdict form, written at the bottom was, "By unanimous agreement the jury recommends counseling."

### DISCUSSION AND DECISION

 The principles governing the admissibility of uncharged misconduct evidence are summarized in *State v. Kitson*, 817 S.W.2d 594 (Mo.App.1991):

In Missouri, evidence of an uncharged crime committed by a defendant is usually not admissible because that evidence may result in a conviction based upon a crime with which the defendant is not charged. *E.g. State v. Mallett*, 732 S.W.2d 527, 534 (Mo. banc 1987), *cert.*

*denied* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987); *State v. Trimble*, 638 S.W.2d 726, 732 (Mo. banc 1982), *cert. denied* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983). The jury may use the evidence of the uncharged crime to infer the defendant has a general criminal disposition, a bad character, or a propensity or proclivity to commit the type of crime charged, which, in turn, results in the jury basing a finding of guilt on the uncharged crime. *Mallett, supra; Trimble, supra.*

There are exceptions to this general rule, however. Evidence of an uncharged crime which has independent logical relevance to a fact in issue may be admissible, *see, e.g. State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307 (banc 1954), if its prejudicial effect does not outweigh its probative value. *Id.; Mallett, supra* 732 S.W.2d at 534. Thus, evidence of an uncharged crime is admissible if it tends to establish motive, intent, identity, the absence of mistake or accident, or a common scheme or plan embracing the commission of two or more crimes so related that the proof of one tends to establish the other. *Mallett, supra,* 732 S.W.2d at 534; *Reese, supra* 274 S.W.2d at 305.

817 S.W.2d at 596–97. The foregoing list of theories for establishing independent logical relevance is not exclusive. *State v. Hutton*, 825 S.W.2d 883, 888 (Mo.App. 1992). *See also Kitson*, 817 S.W.2d at 597 n. 1.

 In this case the state asserts that the challenged evidence was offered and properly admitted to impeach defense witness Sharp and establish her motive and bias for testifying favorably to the defendant. The state argues that the motives, interests, and biases of a witness are always relevant "even though such evidence has no bearing on the issues of the case." [2] As with most rules, however, there are limitations which circumscribe the fore-

---

2. In support of its argument, the state cites *State v. Johnson,* 700 S.W.2d 815 (Mo. banc 1985); *Jablonowski v. Modern Cap Mfg. Co.,* 279 S.W. 89 (Mo. banc 1925); *Barraclough v. Union Pac. R. Co.,* 331 Mo. 157, 52 S.W.2d 998 (1932); *State*

*v. Masslon,* 746 S.W.2d 618 (Mo.App.1988); *State v. Mooney,* 714 S.W.2d 216 (Mo.App.1986); and *State v. Glass,* 554 S.W.2d 426 (Mo.App. 1977).

going general statement of law. *Glass,* 554 S.W.2d at 428. One such limitation is that evidence of other crimes is so highly prejudicial that it should be received only where there is "strict necessity." *State v. Collins,* 669 S.W.2d 933, 936 (Mo. banc 1984) Therefore, when proper impeachment can be had without introducing evidence of other crimes, it is error to allow evidence of other crimes because the prejudicial effect outweighs the necessity for and probative value of the evidence. *Id.*

■ Clearly, the state had the right to impeach Sharp and, indeed, it did so. Substantial evidence was elicited from Sharp about her long relationship with the defendant, her dependence on him, and her attitude toward him. It is apparent that a reasonable jury could not have been anything but very much aware of Sharp's motives, interest, or bias in favor of the defendant. *See Johnson,* 700 S.W.2d at 818. Assuming, without deciding, that evidence of the earlier adult abuse proceeding was relevant as tending to show the defendant's ability to threaten and intimidate Sharp (as argued by the state), the prejudicial effect of such evidence outweighed the necessity for and probative value of the evidence. *See Collins,* 669 S.W.2d at 936; *State v. Owen,* 753 S.W.2d 114, 115 (Mo. App.1988).

■ In so holding, we are mindful that the balancing of prejudicial effect and probative value normally lies within the sound discretion of the trial court. *Mallett,* 732 S.W.2d at 534. However, here we find an abuse of discretion because proper impeachment evidence relating to Sharp existed without the adult abuse evidence (*see Collins,* 669 S.W.2d at 936), placing the details of the defendant's uncharged conduct before the jury by introducing the adult abuse petition was not necessary— Sharp had admitted filing the adult abuse charges—and the obvious effect was to seriously prejudice the defendant (*see Reese,* 274 S.W.2d at 307), and the state unduly emphasized and dwelt on the adult abuse incidents, both in cross-examination and in closing argument (*see State v. Taylor,* 739 S.W.2d 220, 224 (Mo.App.1987)).[3]

Additionally, the possible prejudicial effect of allowing a jury to consider prior bad conduct increases where, as here, the evidence of the defendant's guilt was not overwhelming. Blair's testimony that the defendant pointed the gun at him in an angry and threatening manner was contradicted by three people: the defendant, Sharp, and Ingels. Each testified that Blair pointed the gun at the defendant, threatened to shoot him, and then the defendant took the gun from Blair. They also testified that the defendant, without having pointed the gun at Blair, broke it apart by hitting it against a tree. We recognize that the credibility of the testimony of the four witnesses was for the jury; however, in determining whether the prejudicial effect of the challenged evidence outweighed its probative value, we must consider the substantial conflict in the evidence relating to essential elements of the state's case.

Finally, we read the jury's note on the verdict form—"By unanimous agreement the jury recommends counseling"—as an indication of their belief that the defendant dealt with stressful situations by reacting violently or in a threatening manner. The jury's recommendation, doubtless well-intentioned and possibly well-advised, supports our belief that the adult abuse evidence was used by the jury to infer that the defendant had a general criminal disposition, a bad character, or a propensity for reacting violently when angry—that he was a person who, because of his bad character, must have committed the crime charged. *See Kitson,* 817 S.W.2d at 597–98 [6, 7]. This likely conclusion is precisely why, in Missouri, evidence of an uncharged crime committed by a defendant is usually not admissible because its prejudicial effect outweighs its probative value.

The defendant's first point is dispositive of this appeal; we need not consider the

---

**3.** During closing argument the state argued, over objection, that both Ingels and Sharp had motives to lie, that they were "maybe intimidated to lie," and that "if they don't go along with the story that something bad might happen to them."

second point he raises. The judgment is reversed and the cause remanded for a new trial.

CROW, P.J., dissents in separate opinion.

PARRISH, J., concurs.

CROW, Presiding Judge, dissenting.

I respectfully dissent.

The bias of a witness and his feeling toward a party are never irrelevant. *State v. Johnson,* 700 S.W.2d 815, 817[2] (Mo. banc 1985), *cert. denied,* 476 U.S. 1119, 106 S.Ct. 1980, 90 L.Ed.2d 663 (1986). A party is not confined to answers elicited from a witness on cross-examination, but may prove the witness' bias through extrinsic evidence. *Id.* at 817[3]. Showing the existence and extent of such bias is subject to the sound discretion of the trial court. *Id.* at 817[4].

My study of the transcript persuades me the receipt in evidence of the adult abuse petition filed by witness Sharp against Defendant did not, in the circumstances shown here, constitute reversible error.

First, I find no indication in the transcript that the petition was shown to the jury. Consequently, no juror learned its contents by reading it.

Second, I find no indication in the transcript that the petition was read aloud by anyone in the presence of the jury.

Third, only fragmentary references were made to the petition during cross-examination of witness Sharp. She conceded she had been the object of a "violent, angry outburst" by Defendant, but explained it was "[a]fter I hit him first."

Shown the petition, witness Sharp admitted filing adult abuse actions against Defendant twice. She acknowledged Defendant threatened her in January, 1990. When her attention was directed to the "narrative parts" of the petition, she testified:

He had pulled me over, I did not stay where he was at. I did not know what he was wanting to talk to me about but he had pulled up and I had just left. I

wrote harassment down there because I did not know what it pertained to.

Q But what about the threatening part?

A Before, yes, he had while he was at the house.

Q And part of that is all about he hit you with his fist; is that correct?

Before the witness answered, defense counsel objected and a sidebar conference ensued. When it ended, witness Sharp's testimony continued:

Q You filed this order of protection or request for petition, for order of protection on January 11, 1990, is that right?

A Yes.

Q And I believe you stated that that act occurred on January 8, 1990?

A Yeah, probably, approximately.

Q And the reason—I mean the reason for one of these things is to get something from a judge that keeps him away from you; is that right?

. . . .

A Yes.

Q And I think in here you stated that you had done that one time before?

A Yes. It goes for a limited period of time which I had seen him before my time was ever up. . . . Events like this are history as far as I am concerned.

I find nothing in the record indicating the jury was informed witness Sharp had accused Defendant of causing her physical harm, attempting to physically harm her, unlawfully imprisoning her, tearing up her car so she could not leave, or tearing the phone from the wall so she could not call for help. I therefore respectfully disagree with the majority opinion's conclusion that details of Defendant's uncharged conduct were placed before the jury by the adult abuse petition.

The State's theory was that witness Sharp testified as she did because she was intimidated by Defendant. Her earlier effort to obtain official protection from him could be viewed by a factfinder as indicating Defendant is capable of instilling fear in witness Sharp if she crosses him. In my

view, this was a proper subject to consider in assessing her credibility.

Because the details of the adult abuse petition were not revealed to the jury, receipt of the document itself in evidence had little, if any, adverse effect on Defendant. Accordingly, I am unwilling to convict the trial court of reversible error in receiving the document in evidence.

I would deny Defendant's first point and, as I find no merit in his second, I would affirm the judgment.