**STATE of Missouri, Plaintiff-Respondent,**

v.

**James Darrell STEPHENS, Defendant-Appellant.**

**No. 13151.**

Missouri Court of Appeals, Southern District, Division One.

June 22, 1984.

Stephen R. Soutee, Marionville, for defendant-appellant.

John Ashcroft, Atty. Gen., Deborah Neff and John M. Morris, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Presiding Judge.

A jury found defendant James Stephens guilty of capital murder, § 565.001,[1] and he was sentenced to life imprisonment without probation or parole for at least 50 years. Defendant appeals.

Defendant asserts that the trial court erred in (1) improperly restricting his right to cross-examine state's witness Hollis Freeman, (2) failing to declare a mistrial on the basis of an improper communication between the prosecutor and a juror, and (3) admitting into evidence, over defendant's objection, state's Exhibits 1 and 2, two photographs of the victim. Defendant does not challenge the sufficiency of the evidence to support the conviction.

Officer George Moulat, one of the two members of the police force of Reeds Spring, was murdered, while sitting behind the steering wheel of his patrol car in Reeds Spring, between 11:00 p.m. and 11:30 p.m. on October 16, 1980. His pistol was in its holster with the strap fastened.

The principal witness for the state was Hollis Freeman. Freeman testified that on Thursday, October 16, after drinking beer all day, he, Randy Gamble, and "Tail" Johnson, went to Betty's Bar at Reeds Spring. There they spent the evening drinking, playing pool, and smoking marijuana. Also at the tavern was defendant Stephens with whom Freeman had been acquainted for a couple of years. A trio consisting of Freeman, defendant, and Johnson left the tavern late in the evening, using a Pinto vehicle. The trio headed toward Crane, with defendant driving, Freeman sitting on the passenger's side of the front seat, and Johnson in the back seat. As the Pinto drove through the business area of Reeds Spring they saw the parked police car and defendant said, "I ought to just shoot that man." Freeman was "pretty well intoxicated." The next thing Freeman remembered was being in Galena, a nearby town, and seeing the defendant coming out of a mobile home carrying a shotgun.

Defendant then drove the trio to Reeds Spring where, at the request of defendant, Freeman took over the driving and the defendant got in on the passenger's side. Defendant told Freeman to pull alongside the parked police car and Freeman did so. While the vehicles were three feet apart

---

1. All references to statutes are to RSMo 1978, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

defendant pointed the shotgun at the police officer and fired the gun. The officer's head jerked. Defendant said, "I shot that punk, let's go." The three men went into a rural area where defendant "took the gun apart" and defendant and Freeman covered it with leaves. Johnson, who was drunk, had no memory of the significant events.

The next morning, Friday, Freeman, acting alone, moved the gun to another remote hiding place and "covered it with leaves and stuff and laid it by a log." The following Monday, after talking with his father, Freeman reported the matter to the authorities and led a sheriff and an FBI agent to the place where the gun was hidden. Freeman gave the officers a statement and the instant charge was filed against defendant.

Testifying in his own behalf, defendant admitted leaving Reeds Spring in the Pinto with Freeman and Johnson. He denied shooting the officer and testified that the only thing he remembered was "waking up on the way to Crane" and Freeman was driving. Through cross-examination of some of the state's witnesses, including the coroner, the sheriff, and a pathologist, the latter having performed an autopsy on the exhumed body of the victim on December 1, 1980, the defense attempted to show that the murder occurred at a time when the defendant was at a middle-of-the-night party at Crane in the presence of other defense witnesses. The defense attempted, without much success, to pinpoint the time of death.

Defendant's first point is that the trial court erred in sustaining the state's objections to the following questions directed to state's witness Freeman on cross-examination by defense counsel: "How many lawns have you mowed as of this date?" "Now, Hollie, you have not—you did not have any income between July of 1980 and up to the first two weeks in October, 1980?" "Was [the Candlelight Inn] closed for a while during the time you were operating it (1977)?" "Have you ever been charged with burglary and stealing, Hollie?"

Defendant argues that the trial court, in sustaining objections to the foregoing questions, denied him his right to cross-examine Freeman, "prevented legitimate exploration of subjects introduced on direct examination, and denied legitimate opportunities for impeachment of the witness."

"The extent of cross-examination on collateral matters for the purpose of impeachment is largely within the trial court's discretion.... Absent a clear showing of an abuse of discretion, ... its ruling will not be disturbed." *State v. Daniels,* 649 S.W.2d 568, 570[3] (Mo.App.1983). See also *State v. Weekley,* 621 S.W.2d 256, 260[4] (Mo.1981).

On direct examination Freeman testified that his employment at the time of trial (August 1981) was "mowing yards," and that he had been doing that for three months. Before that he worked for a construction company but was fired for sleeping on the job. Prior to that he worked as a steam presser for a month and before that he worked as a backhoe operator but left that employment because he was fired. His employer considered him "responsible for a truck being stolen." In 1977 or 1978 he ran the Candlelight Inn Tavern in Crane. Freeman also testified that he had prior convictions for signing "bogus payroll checks" and possessing marijuana.

On cross-examination Freeman testified that he did not have regular employment after July 1980 except for the last three months when he had a job working for a lawn service. He admitted that he had two convictions for possession of marijuana in addition to the "forgery charge." He testified that while he operated the Candlelight Inn he applied to the Missouri Department of Beverage Control for a license and he had to state on the application whether or not he had any prior criminal convictions. He testified, however, that the application was made before he "had any criminal convictions."

■ From the foregoing it is clear that the defense was permitted to develop the facts that Freeman was an ex-convict with several convictions and that his employ-

ment history was checked and stained. Additional evidence as to how many lawns he had mowed, or whether he had any income between July 1980 and mid-October 1980, and whether his tavern was closed "for a while" three or four years prior to the murder, would constitute collateral matters of little, if any, significance.

■ The inquiry as to whether the witness had ever been "charged" with burglary and stealing was improper. "[T]he credibility of a witness may not be attacked by showing his arrest and a pending charge which has not resulted in a conviction.... It would be error to ask a witness if he has been arrested for or charged with a crime or in jail awaiting trial on a pending charge." *State v. Lockhart*, 507 S.W.2d 395, 396[1, 2] (Mo.1974). See also *State v. Massa*, 512 S.W.2d 912, 914[2, 3] (Mo.App. 1974). In *Lockhart* the court pointed out that exceptions to the rule may arise where the inquiry shows a specific interest of the witness or where it shows a possible motivation of the witness to testify favorably for the government or where it shows the testimony of the government witness was given in expectation of leniency. None of those exceptions applies here with respect to a charge of burglary and stealing.

The defense was permitted to show, and did show, that Freeman himself had been charged with the murder of officer Moulat but "the charge was recalled by the prosecuting attorney" and no arrest warrant was executed nor was Freeman notified of "the complaint or warrant."

The trial court did not abuse its discretion in sustaining the state's objections to the quoted questions. Defendant's first point has no merit.

Defendant's second point is that the trial court erred in denying defendant's motion for a mistrial based upon an improper communication between the prosecuting attorney and juror Dodd. After a brief recess during the presentation of the defendant's case, defense counsel Soutee made this statement to the court, outside the hearing of the jury: "Your Honor, at this time as we came from chambers, I walked in here with the prosecuting attorney, and the prosecuting attorney walked right back over to the jury box and made a statement to juror Dodd and there was a conversation between the two of them, and I move at this time for a mistrial. Counsel conversing with a juror is highly improper and highly prejudicial to my client and I respectfully ask the court to declare a mistrial in this case."

The court then excused all jurors except juror Dodd and asked Mrs. Dodd to come to his chambers with the attorneys.

In chambers the court informed Mrs. Dodd that he had been told that the prosecutor "made some statement to you or had some sort of a conversation with you. Did Mr. McCullah (the prosecutor) make a statement to you at that time—perhaps you should be sworn."

Juror Dodd, having been sworn, stated that Mr. McCullah did make a statement to her a few minutes ago. The juror then said: "He said, 'I'm sorry if I scared you before.' Just before you all came back here, he threw or slammed down his book and I jumped, and he just said he was sorry if he scared me. I don't know what I said, but I think I said, 'Okay.' I can't remember if anything else was said or not, but I think that's all that was said."

The court then said, "Does counsel have any questions," and defense counsel and the prosecutor both replied, "No, Your Honor." The court then told Mrs. Dodd that she could resume her seat in the jury box and she did so. The court then stated to counsel that he did not believe the statement made to Mrs. Dodd constituted grounds for a mistrial and asked the prosecutor if that was the only statement he made to Mrs. Dodd and the prosecutor said it was. The court then said, "The court will admonish counsel not to talk to any of the jurors and make no statement to any of them of any nature." The jury was called back and the trial resumed.

Rule 4 contains the Code of Professional Responsibility and DR 7–108 deals with communications with jurors. It provides,

in part, that during the trial of the case a lawyer connected therewith shall not communicate with any member of the jury, although a lawyer is not prohibited "from communicating with jurors in the course of official proceedings." See, generally, *United States v. Betner,* 489 F.2d 116 (5th Cir.1974); *Pekar v. United States,* 315 F.2d 319 (5th Cir.1963). See also 22 A.L.R. 254, 270 (Communications Between Jurors and Counsel—Criminal Cases).

 Although this court disapproves of the prosecutor's conduct, it seems clear that it was not calculated and that the remark to juror Dodd was innocuous. The trial court was in the best position to observe the impact of the fleeting episode. This court holds that the trial court did not abuse his discretion in denying the motion for mistrial. Defendant's second point has no merit.

Defendant's third point is that the trial court erred in admitting into evidence, over defendant's objection, state's Exhibits 1 and 2, which were photographs of the victim seated in the patrol car. Exhibit 1 is a close-up view of the face and chest of the dead officer. In taking Exhibit 2 the camera was perhaps 30 feet from the vehicle and the exhibit shows the vehicle, its dead occupant, and surrounding buildings. In this court defendant renews his objection that the photographs are inflammatory and lack probative value.

The trial court has broad discretion in determining the admissibility of demonstrative evidence. Our supreme court has said that a photograph "should not be rejected because by presenting an accurate portrayal it tends to be inflammatory." *State v. Burnfin,* 606 S.W.2d 629 (Mo. 1980).

State's Exhibit 1 shows the nature of the fatal head wound. The state's evidence was that defendant used a 20-gauge shotgun in killing officer Moulat. A gun dealer testified that he had sold that weapon to defendant several months before the murder. The photographs lend support to the state's theory that the murder weapon was a shotgun.

The defense was alibi and defense counsel attempted to pinpoint the moment of death. The wound depicted in Exhibit 1 was of the nature that a layman might reasonably infer that death was instantaneous. State's Exhibit 2 was an accurate portrayal of the general area of the crime. It cannot properly be said that the exhibits lacked probative value. The trial court properly received them. *State v. Adams,* 654 S.W.2d 376, 378[4] (Mo.App.1983); *State v. Moody,* 645 S.W.2d 152, 158 (Mo. App.1982). Defendant's third point has no merit.

The judgment is affirmed.

GREENE, C.J., and TITUS and CROW, JJ., concur.