STATE of Missouri, Respondent,

v.

Jerome MALLETT, Appellant.

No. 68030.

Supreme Court of Missouri,
En Banc.

June 16, 1987.

Dissenting Opinion July 14, 1987
(Blackmar, Judge).

Rehearing Denied July 14, 1987.

Kathleen Murphy Markie, Columbia, for appellant.

William L. Webster, Atty. Gen., and John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Judge.

Defendant Jerome Mallett was convicted of the first degree murder, § 565.020, RSMo 1986, of Missouri State Highway Patrol Trooper James M. Froemsdorf and sentenced to death, the jury finding the following statutory aggravating circumstances: (1) the murder was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind, § 565.-032.2(7), RSMo 1986; (2) the murder was committed against a peace officer while engaged in the performance of his official duty, § 565.032.2(8), and (3) the murder was committed by a person who had escaped from the lawful custody of a peace officer, § 565.032.2(9). Affirmed.

Defendant contends: (1) the evidence was insufficient to support his verdict; (2) evidence of crimes he committed in Texas shortly before the murder was erroneously admitted at trial; (3) an instruction on the defense of accident should have been submitted; (4) an instruction on circumstantial evidence should have been submitted; (5) the prosecutor improperly argued his character during the guilt phase; (6) evidence of his character and prior criminal activities was erroneously admitted during the penalty phase; (7) one witness improperly testified as an expert; (8) his videotaped statement was erroneously admitted; (9) Missouri's death penalty is discriminatorily applied; (10) Missouri's death penalty is unconstitutional; (11) his sentence was imposed under the influence of passion and prejudice; and (12) his sentence is disproportionate to sentence imposed in similar cases.

In assessing a sufficiency of the evidence challenge, the evidence, together with all reasonable inferences to be drawn therefrom, is viewed in the light most favorable to the verdict and evidence and inferences contrary to the verdict are ignored. *E.g., State v. Guinan*, 665 S.W.2d 325, 327 (Mo. banc), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984).

On February 4, 1985, defendant robbed a jewelry store in Plano, Texas. Based upon the robbery victim's identification of defendant as the holdup man, the Plano police obtained a warrant for defendant's arrest. The warrant was placed in the computer system of the National Crime Information Center (N.C.I.C.). The N.C.I.C. is a system that provides law enforcement agencies nationwide access to information on persons wanted for criminal offenses. The last information sent by the Plano police to the N.C.I.C. was that defendant might be returning to Missouri.

Shortly after 5:30 p.m., on March 2, 1985, defendant, driving a white over copper Ford, was pulled over for speeding on Interstate 55 in Perry County by Trooper James Froemsdorf. Before Trooper Froemsdorf approached his vehicle, defendant hid his wallet and identification under the front seat. When Trooper Froemsdorf arrived and asked for his driver's license, defendant replied that he did not have it with him. Defendant told Trooper Froemsdorf that his name was Anthony Mallet. Anthony Mallet is defendant's brother. Trooper Froemsdorf handcuffed defendant and then in a search of the Ford found several items bearing the name "Jerome Mallet," including defendant's wallet containing a Texas driver's license and several pawnshop tickets.

Returning to his patrol car with these items, Trooper Froemsdorf called in to the Highway Patrol radio dispatcher. After running a check on the driver's license, the dispatcher informed Trooper Froemsdorf that defendant was wanted in Texas on four warrants for probation violation and one warrant for aggravated robbery. At 5:40 p.m., Trooper Froemsdorf, in his last radio transmission, told the dispatcher that defendant was in custody, that he needed no assistance, and that the dispatcher could contact him next at the Perry County Sheriff's Office.

At approximately 6:00 p.m., a passing motorist, curious at seeing an apparently unoccupied patrol car with its red lights flashing, stopped to investigate and found Trooper Froemsdorf's body. At 6:15 p.m., a highway patrol trooper also arrived at the scene. The trooper called for medical personnel who subsequently pronounced Trooper Froemsdorf dead.

The inside of Trooper Froemsdorf's patrol car was a shambles, evidencing a struggle. Found in the patrol car were defendant's driver's license and the other identifying items Trooper Froemsdorf had taken from defendant's vehicle, along with a partially filled out speeding ticket for defendant and a handwritten note listing defendant's Texas warrants. Missing from the patrol car was Trooper Froemsdorf's service revolver, a .357 magnum. On the hood of the car investigators later found defendant's palm print.

Around 7:00 p.m. that evening, a St. Francois County deputy sheriff sighted defendant's copper and white Ford and began a pursuit. The chase ended with defendant missing a turn, running up an embankment, and crashing through a fence into a field. Defendant evaded capture by quickly exiting the vehicle and fleeing on foot. On the front floorboard of defendant's car the deputy found Trooper Froemsdorf's service revolver. The weapon contained four spent and two unspent shells. The only fingerprint found on the revolver belonged to defendant. Defendant's fingerprints were also on the door of the Ford.

After fleeing, defendant swam across a river and spent the first night in a car in a nearby garage, where he also stole a jacket and shoes to replace his own wet clothing. Leaving the garage the next day, defendant saw signs of a search and stole away to a barn where he burrowed under some hay. After spending two nights in the barn, defendant attempted to reach a nearby McDonald's for food. Law enforcement officers, who had been conducting an extensive search, spotted defendant and captured him following a brief pursuit. The officers noticed that handcuffs dangled from defendant's left wrist. When the right cuff was placed on defendant's right wrist, it slid halfway down his hand. It was ultimately discovered that defendant had suffered an injury to his right hand as a child which enabled him to compress it to nearly the size of his wrist and slip out of handcuffs. After defendant was resecured, he was taken to a highway patrol station where he waived his *Miranda* rights and gave a video-taped statement. In the statement defendant admitted shooting Froemsdorf, but claimed it was accidental.

In the investigation of the killing of Trooper Froemsdorf, an autopsy was performed on his body. Large bruises and numerous abrasions were evident on Trooper Froemsdorf's face, primarily on the left side. Under the trooper's left eye was a serrated cut which matched the ratchet on

handcuffs used by the highway patrol. Abrasions on the left side of the chin matched the solid portion of the handcuffs. The pathologist testified that this cut and these abrasions were consistent with a blow or blows to the trooper's face with the handcuffs. Such blows, the pathologist continued, would immediately cause the eyes to water and blind a person for a brief period of time.

On the lower left side of the trooper's chest was a 7.7 by 4.0 centimeter abrasion surrounded by a large area of bruising. This wound was inflicted by the impact from short range of a .357 magnum bullet into Trooper Froemsdorf's bulletproof vest. Tests of the bullet causing the wound, which was found imbedded in the vest, indicated that it had been fired from Trooper Froemsdorf's service revolver. The impact of a .357 magnum bullet from short range, the pathologist testified, would knock the breath out of the victim and render him helpless for a short time.

On the right side of Trooper Froemsdorf's neck, about an inch and a half apart, were the entrance wounds of two gunshots. The slug causing the lower wound passed through the victim's trachea and carotid artery and exited out of the left side of the neck. Such a wound would cause heavy bleeding and hamper the victim's breathing. The slug causing the higher wound fractured two vertebrae and severely damaged the spinal cord before also exiting out of the left side of the neck. The effect of this wound was the instantaneous death of Trooper James Froemsdorf.

Both the bullets which pierced the victim's neck left the neck at a higher point than they entered. After exiting the neck, one of the bullets struck the chrome strip at the bottom of the front driver's side window and the other went through the driver's seat and passed out of the car through the left rear door. The combination of the upward angle of the slugs through Trooper Froemsdorf's neck with the slugs' impact points with the car led defendant's firearms expert to conclude Trooper Froemsdorf was leaning downward toward the driver's door and away from the passenger's seat when he was shot. This was the position in which the body was, in fact, found.

Besides the three slugs which hit Trooper Froemsdorf's body, there was alos evidence of a fourth shot which plowed a furrow in the right epaulet of the trooper's uniform shirt and shattered the driver's window of the patrol car. Defendant's firearms expert testified that he believed that this shot that shattered the window was the first one to be fired. In his opinion, the second shot hit the trooper's bullet proof vest and the third and fourth shots went through the trooper's neck. The pathologist agreed that the shot to the vest occurred before the shots through the neck.

Forensic analysis of the powder burn "stippling" on the victim's neck indicated that the muzzle of the murder weapon was from twelve to eighteen inches away from the neck at the time the shots were fired. Tests to determine the presence of gunshot residue on Trooper Froemsdorf's hands established the presence of such residue only on his left palm. This is consistent with him having his left hand raised in front of the muzzle of a discharging revolver, but not with him having fired the revolver himself.

Given the evidence outlined above, a jury could have made the following reasonable inferences as to the events which occurred after Trooper Froemsdorf's last radio transmission to the dispatcher and which ended with his death.

After his final contact with the dispatcher, Trooper Froemsdorf led defendant back to his patrol car and ordered him into the front passenger's seat. The trooper got into the driver's seat and began to write a speeding ticket for defendant. Meanwhile, defendant, fearing that the Texas warrants for his arrest would soon be discovered (or perhaps even knowing they had already been found) and that he would be extradited to Texas for near certain jail time, managed to work his right hand out of the handcuffs. While liberating himself from the handcuffs, defendant decided to attack Trooper Froemsdorf, kill him if he could,

and make a break for freedom. Using his handcuffed left hand, defendant, without warning, struck Trooper Froemsdorf repeatedly across the face. On one blow, the ratchet of the handcuffs cut into the area below the trooper's left eye, temporarily blinding him. Despite defendant's fierce onslaught and his own injuries, Trooper Froemsdorf struggled as best he could to subdue defendant. While Trooper Froemsdorf was hampered by his temporary inability to see and other injuries, defendant managed to draw the trooper's .357 magnum service revolver from the holster on his right hip. Defendant's first shot was wild, grazing the trooper's right epaulet before shattering the driver's window. Defendant's second shot hit the trooper in the left lower chest. Although this slug was stopped by the bullet proof vest which Trooper Froemsdorf was wearing under his uniform shirt, its impact slammed him back against the driver's door, knocked him breathless, and rendered him helpless for a time. Then defendant, taking advantage of Trooper Froemsdorf's momentary defenselessness, fired two slugs at point-blank range into the officer's neck, killing him.

■ In order for a jury to return a verdict of guilt on first degree murder, it must reasonably find, beyond a reasonable doubt, that the defendant knowingly caused the death of another person after deliberation upon the matter. Section 565.020.1, RSMo 1986. The evidence and inferences that defendant killed Trooper Froemsdorf through the use of a deadly weapon on a vital part of his body support a jury finding that defendant knowingly fired the trooper's revolver with the awareness that the bullets were practically certain to cause his death. *See State v. LaRette*, 648 S.W.2d 96, 103 (Mo. banc), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). The evidence that defendant had to slip out of handcuffs before attacking Trooper Froemsdorf gives rise to the reasonable inference that defendant reflected for a time about killing the Trooper. The evidence that the shot to Trooper Froemsdorf's chest would have temporarily incapacitated him gives rise to the reasonable inference that defendant reflected fur-

ther upon whether to send two slugs through the trooper's neck. Either of these inferences would support a jury finding of deliberation. *See* § 565.002(3), RSMo 1986 (" 'Deliberation' means cool reflection for any length of time no matter how brief"). *See also State v. Roberts*, 709 S.W.2d 857, 862–63 (Mo. banc), *cert. denied*, —— U.S. ——, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986); and *State v. McDonald*, 661 S.W.2d 497, 500–501 (Mo. banc 1983), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985), for somewhat similar facts which were found to support a finding of deliberation.

Defendant urges that the facts and circumstances adduced at trial are at least as consistent with his story that the death of Trooper Froemsdorf was accidental as they are with the inferences, outlined above, that he assaulted the trooper, drew his revolver, and knowingly and deliberately shot and killed him. Defendant's story was that Trooper Froemsdorf, after seating defendant in the patrol car, struck him lightly twice and accused him of lying about his name and not having his driver's license; that defendant slipped his hand out of the handcuffs and grabbed the trooper's arms to prevent further physical abuse to himself; that Trooper Froemsdorf drew his revolver; that defendant, fearing the trooper would shoot him, clutched at the trooper's hands and the gun and butted the trooper in the face with his head several times; and that in the course of the struggle, while Trooper Froemsdorf's finger was on the trigger, the gun fired several times.

■ Defendant's version of events, however, is not consistent with the evidence. First, the bruises and abrasions on Trooper Froemsdorf's face were consistent with being struck by handcuffs, and not with being butted by defendant's head. Second, although defendant asserts that Trooper Froemsdorf drew his service revolver and had his finger on the trigger when it discharged, the only fingerprint on the weapon was defendant's. Also Trooper Froemsdorf's hands had gunshot residue only on the left palm. As stated above, this resi-

due pattern is consistent with the trooper having held his hand up in front of a firing revolver, but inconsistent with Trooper Froemsdorf having himself fired the weapon. Third, the slugs penetrating Trooper Froemsdorf's neck caused immediate and heavy bleeding and a considerable amount of blood covered the trooper's hands and shirt. Defendant's claim that the four shots were fired while he was grappling with the trooper for the gun is thus belied by defendant's admission that he had none of the trooper's blood on himself. Fourth, defendant's claim that each shot was fired during a struggle while Trooper Froemsdorf's finger was on the trigger is inconsistent with medical testimony as to the effect of the trooper's wounds. The slug which buried itself in the trooper's bulletproof vest, which defendant admits was the first to hit the trooper, would have knocked him breathless and rendered him temporarily unresponsive. The trooper would thereafter be incapable of continuing the struggle for the revolver for a time or of keeping his finger on the trigger. Even if Trooper Froemsdorf had been able to tense his finger on the trigger after being hit in the chest, either subsequent shot to the neck would have completely disabled him, thus preventing him even from inadvertantly pulling the trigger for the second shot to the neck. Fifth, defendant's version of events is refuted by the trajectories of the bullets penetrating Trooper Froemsdorf's neck. These bullets entered the trooper's neck an inch and a half apart and at nearly identical angles. This evidence, combined with the testimony that a .357 magnum recoils backward and upward when discharged, is inconsistent with the claim that the trooper's .357 magnum was fired randomly during a struggle. Sixth, defendant had reason to fear that the Texas warrants for his arrest for probation violations and aggravated robbery would be discovered. Thus, he had a motive to murder Trooper Froemsdorf so that he could avoid being returned to Texas for a lengthy period of incarceration. The presence of motive is a factor consistent with defendant's guilt, *see State v. Stapleton,* 518 S.W.2d 292, 296 (Mo. banc 1975), and inconsistent with defendant's story that the shooting of Trooper Froemsdorf was an accidental and motiveless event.

Considering all the evidence, together with all reasonable inferences therefrom, which supports the verdict, and casting aside all contrary evidence and inferences, the jury could reasonably find, beyond a reasonable doubt, that defendant knowingly shot Trooper Froemsdorf to death after deliberation upon the matter.

Defendant next contends that the trial court erred in admitting evidence that he had robbed a jewelry store in Plano, Texas the month before Trooper Froemsdorf was murdered. He argues that the admission of this evidence was irrelevant and highly prejudicial in that, while it had no legitimate bearing on his guilt on the murder charge, it, in fact, tended to raise in the minds of the jurors an unwarranted presumption of guilt on that murder charge.

■ Evidence of commission by defendant of crimes separate and distinct from the crime for which he is charged is generally inadmissible. *E.g., State v. Shaw,* 636 S.W.2d 667, 671–72 (Mo. banc), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982). But such evidence is generally admissible to prove the crime charged when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other, or the identity of the person charged with the commission of the crime on trial. *E.g., id.* at 672. Evidence of other crimes should be admitted under one of these exceptions only when the prejudicial effect of the evidence is outweighed by its probative value. This balancing of prejudicial effect and probative value lies within the sound discretion of the trial court. *E.g., id.*

■ The evidence presented here of defendant's robbery of the Texas jewelry store was admissible to show defendant's motive for killing Trooper Froemsdorf. Defendant's knowledge that he would quite probably be returned to Texas to face aggravated robbery charges for acts he com-

mitted while already in violation of his probation gave him a very discernible reason to kill Trooper Froemsdorf. Although the introduction of this evidence put before the jury evidence of a crime for which defendant had never been convicted, the probative value of the evidence was greater than any prejudicial effect. The great probative value of evidence of motive is made clear in *State v. Stapleton*, 518 S.W.2d 292, 296 (Mo. banc 1975), where this Court noted that the absence of motive has been a pivotal factor in determinations as to the sufficiency of the evidence. The evidence of motive in this case was particularly probative because it tended to refute defendant's story that the shots were fired accidentally. *See State v. Crabtree*, 625 S.W.2d 670, 676 (Mo.App.1981). Evidence of other crimes has frequently been admitted to show motive, despite any incidental prejudice to defendant. *See, e.g., State v. Williams*, 652 S.W.2d 102, 110 (Mo. banc 1983); *State v. Graham*, 641 S.W.2d 102, 105 (Mo. banc 1982); *State v. Trimble*, 638 S.W.2d 726, 732–33 (Mo. banc 1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983); *State v. Shaw*, 636 S.W.2d at 672. The trial court did not abuse its discretion by admitting evidence of the Texas robbery.

Defendant further argues that, even if some evidence of the Texas robbery was admissible, the trial court erred in permitting the state to present the details of the robbery. Defendant asserts that the state's theory as to motive was established by testimony that word of the Texas warrants for the arrest of defendant for aggravated robbery and probation violations had been transmitted to Trooper Froemsdorf and that he had radioed in that he had defendant in custody and was on the way to the Perry County Sheriff's Office. Admission of any further details of the robbery, defendant concludes, added nothing to the state's theory of motive but greatly increased the prejudice to defendant.

Contrary to defendant's argument, introduction of the detailed evidence of the Texas robbery was necessary in order for the state to establish motive. The state would not have made a sufficient showing of mo-

tive simply by presenting evidence that Trooper Froemsdorf knew of the warrant for defendant's arrest for robbery. Rather, the state needed to show that defendant knew he was wanted for the robbery. Only then would defendant have had a reason to escape from Trooper Froemsdorf by killing him, because only in this case would defendant have had reason to believe a traffic stop would result in the connection of himself to the robbery and his subsequent return to Texas for trial and, given the evidence, probable conviction and a lengthy sentence. *Cf. State v. Willis*, 632 S.W.2d 63, 65 (Mo.App.1982) (evidence that defendant would gain financially under an insurance policy on the victim admissible only if defendant knew of existence of the policy, that it was in force, and that he could gain under the policy by the death of the victim). Only by introducing evidence of the manner in which the jewelry store was robbed could the state show that defendant knew he was wanted for the robbery. The state therefore presented testimony that a man had entered the Plano jewelry store and had spoken to both sales clerks at some length without attempting to conceal his face in any way. He was wearing a gold necklace monogrammed with the letter "M". The clerks recognized him as being the same man who had been in two weeks earlier and had unsuccessfully attempted to purchase jewelry with an insufficient funds check. The man had filled out a sales ticket at that time and had given defendant's name. After looking at diamond pendants, the man drew a nickle-plated revolver, ordered the clerks to place jewelry in a bag he was holding, had them lie on the floor, and left. At trial, one of the clerks testified that she recognized defendant as the man who had committed the robbery.

These details of the robbery give rise to the reasonable inference that defendant knew he was wanted for the robbery and thus that he had a motive to resist being taken into custody. Wide latitude is generally allowed in the development of evidence of motive. *State v. Holt*, 592 S.W.2d 759, 775 (Mo. banc 1980). Be-

cause of this wide latitude and the great probative value of evidence of motive, the Court concludes that the trial court did not abuse its discretion in admitting detailed evidence of the Texas robbery.

■ Also with respect to evidence of the Texas robbery, defendant urges that pawn tickets found in Trooper Froemsdorf's patrol car were erroneously admitted into evidence and read to the jury because the information contained on the pawn tickets, particularly notations on most of the tickets that the item pawned was jewelry, constituted inadmissible hearsay connecting defendant to the robbery. The rule that hearsay is inadmissible, however, has no application where the extrajudicial statement is not offered as proof of the matters asserted therein. *State v. Hale,* 371 S.W.2d 249, 254 (Mo.1963). The pawn tickets here were admitted by the trial court not as proof of the matter asserted therein (that certain items were pawned by defendant), but as proof of defendant's presence at the murder scene. Defendant attempts to bring the pawn tickets within the bounds of the hearsay rule by pointing to a statement made out of the hearing of the jury by one of the prosecutors which suggests that the pawn tickets were offered to show defendant's connection with the Texas robbery. This attempt fails because the principal prosecutor had previously stated that he was offering the pawn tickets solely to show defendant's presence at the crime scene, because the trial court admitted the tickets for the sole purpose of showing defendant's presence at the scene, and because the tickets were never used by the state for any purpose other than showing the defendant's presence at the scene.

■ Defendant next argues that the trial court erred in failing to instruct the jury on the defense of accident (excusable homicide). No need exists, however, for a separate instruction on accident because, under the current Missouri statute on the defense of accident, § 563.070, RSMo 1986 (effective October 1, 1984, five months before

the murder of Trooper Froemsdorf), a finding of the elements of any homicide offense is inconsistent with such a defense. MAI–CR3d 304.11, part D.[1] Thus an instruction on accident would have been redundant. No error was committed by the trial court in refusing to submit the requested accident instruction.

■ Defendant also assigns error to the trial court's refusal to submit his requested instruction on the definition and use of circumstantial evidence. The requested instruction was identical to MAI–CR2d 3.42. Defendant acknowledges that a circumstantial evidence instruction need not be given in a case where the evidence is partially direct and partially circumstantial. *See, e.g., State v. Griffin,* 662 S.W.2d 854, 857 (Mo. banc 1983), *cert. denied,* 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 153 (1984). In defendant's videotaped statement, which was introduced into evidence, defendant, in describing what happened in the patrol car, said:

> When we was wrestlin' [for the gun] the gun went off and ... shot up somewhere. I shot him again when I was taking it from him. I shot again. Then just shot again.

This is direct evidence that defendant shot Trooper Froemsdorf. This direct evidence obviated the requirement that a circumstantial evidence instruction be given.

■ Defendant argues that the trial court erred in permitting the state to argue defendant's supposed bad character in closing argument. No foundation was laid for appellate review of this point because defendant made no objections on this ground during the state's closing argument. The Court, nevertheless, has examined the closing argument for plain error and has found no manifest injustice or miscarriage of justice. *See* Rule 30.20. At no point did the prosecutor directly or indirectly urge the jury to convict defendant because of his bad character or his criminal proclivities. The challenged comments were either made for the permissible purpose of attacking

---

**1.** Although MAI–CR 3d was not effective at the time of the offense on trial in this case, it does make clear why MAI–CR 2d 2.28, an instruction

form on accident, was withdrawn effective October 1, 1984, five months before the offense here.

defendant's credibility or were permissible arguments upon such propositions as the prevalence of crime and the jury's duty to uphold the law. *See, e.g., State v. Newlon,* 627 S.W.2d 606, 619 (Mo. banc), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982).

Defendant next contends that the state was erroneously permitted to introduce evidence of defendant's character and prior criminal record,·in proof of non-statutory aggravating circumstances, in the penalty phase of the trial because it failed to comply with the notice provision of § 565.005.1, RSMo 1986. Section 565.005.1(1) provides:

At a reasonable time before the commencement of the first stage of any trial of murder in the first degree at which the death penalty is not waived, the state and defendant, *upon request* and without order of the court, shall serve counsel of the opposing party with: (1) A list of all aggravating or mitigating circumstances as provided in subsection 1 of Section 565.032, which the party intends to prove at the second stage of the trial....

(Emphasis added). Section 565.032.1, RSMo 1986, provides in pertinent part:

In all cases of murder in the first degree for which the death penalty is authorized, the judge in a jury-waived trial shall consider, or he shall include in his instructions to the jury for it to consider

* * * * * *

(3) Any mitigating or aggravating circumstances otherwise authorized by law and supported by the evidence and requested by a party including any aspect of the defendant's character, the record of any prior criminal convictions, and pleas and findings of guilty and admissions of guilt of any crime or pleas of nolo contendere of the defendant

Defendant's contention here fails because he never made the required request for disclosure under § 565.005 of the aggravating circumstances which the state intended to prove. It is noted that defendant, despite this lack of request, was not taken unaware or otherwise prejudiced by the admission of evidence relating to his character and prior criminal record or by the submission of the non-statutory aggravating circumstances, which were premised upon his prior convictions. By at least a month before trial, the state had voluntarily provided defendant with copies of all certified convictions which it planned to introduce as penalty phase exhibits and with written notice of the witnesses it intended to call during the penalty phase.

Defendant's next argument is that the trial court erred in permitting the testimony of state's witness Dr. Zaricor concerning the order in which the shots struck Trooper Froemsdorf and concerning the effect upon a person wearing a bulletproof vest of being shot in the chest by a .357 magnum because Dr. Zaricor was not qualified as an expert in these areas.

With respect to Dr. Zaricor's testimony regarding the impact of a .357 magnum slug on a person wearing a bulletproof vest, defendant made no objection when Dr. Zaricor first gave his opinion. The objection made when Dr. Zaricor repeated his opinion five days later after being called by the defense was untimely. The Court, however, has reviewed defendant's challenge to this testimony and has found no error, plain or otherwise. The test of expert qualification is whether he has knowledge from education or experience which will aid the trier of fact. *State v. Garrett,* 682 S.W.2d 153, 155 (Mo.App. 1984). The qualification of an expert is a matter resting primarily in the sound discretion of the trial court. *State v. Jones,* 594 S.W.2d 932, 938 (Mo.1980). Dr. Zaricor's qualifications to testify on this topic were quite sufficient. He was a pathologist who had conducted forty or fifty autopsies involving gunshot wounds and observed two hundred others, including five where the weapon used was a .357 magnum. He had talked to people who had been shot while wearing bulletproof vests. Dr. Zaricor had also seen abrasions like that inflicted on Trooper Froemsdorf by the shot into his bulletproof vest. Moreover, his evaluation as to the effect of this

injury was primarily a medical one and thus certainly within his field of expertise. The trial court did not abuse its discretion in admitting Dr. Zaricor's testimony on this topic.

■■■ With respect to Dr. Zaricor's testimony regarding the order of shots, error, if any, in admission of the testimony was non-prejudicial. Dr. Zaricor's opinion as to the order of shots was exactly the same as that of defendant's firearms expert.

■■■ Defendant's next assignment of error is that his videotaped statement was improperly admitted into evidence because it was not made voluntarily. Any challenge to the introduction of the videotaped statement, however, has been waived. Before trial, defendant moved to suppress only an oral statement he made to police. Defense counsel advised the trial court that "we chose, as part of our trial strategy, not to file a motion to suppress the videotaped statement". At the close of the state's evidence, defendant filed a motion requesting permission to introduce his post-arrest statements as defense evidence. The motion was denied. When the videotaped statement was introduced by the state to impeach defendant's testimony, defense counsel stated that he had no objection. Given defendant's trial strategy not to move to suppress the videotaped statement, his desire during trial to have the tape admitted, and his express consent to its admission by the state, he cannot now claim that the admission of the tape was erroneous. *See State v. Crawley,* 501 S.W.2d 31, 33 (Mo.1973). On its own initiative, the Court has examined the admission of the videotaped statement for plain error, Rule 30.20, and found none. That no manifest injustice could have resulted from the introduction of the videotaped statement is evidenced by defendant's desire to have his post-arrest statements admitted in his own behalf.

Defendant next challenges the constitutionality of Missouri's death penalty statutes on the ground that they are applied in

a racially discriminatory manner. In support of this challenge defendant offered the following statistics. Of those individuals (excluding appellant) who have been sentenced to death in Missouri since 1977, 39% are non-white. Of these non-white death row inmates, 53% had white victims. Of the white death row inmates, 74% had white victims. Missouri's racial composition is 88.4% white and 11.6% non-white. Defendant asserts that these statistics indicate that non-whites are more likely to be sentenced to death than whites and that killers of whites are more likely to be sentenced to death than killers of non-whites. As a black defendant who killed a white victim, defendant further claims that these statistics demonstrate that he was discriminated against because of his race and because of the race of his victim. Therefore, defendant appears to conclude, Missouri's death penalty in general and his death sentence in particular violate the equal protection clause of the fourteenth amendment to the United States Constitution.

■■■ In order to establish an equal protection violation, a defendant must show an intent to discriminate. *E.g., McCleskey v. Kemp,* —— U.S. ——, 107 S.Ct. 1756, 1766, 95 L.Ed.2d 262 (1987). Defendant's evidence to prove intentional discrimination in this case consists of statistics.[2] Statistics indicating a disparate impact seldom suffice to establish an equal protection claim. *E.g., Adams v. Wainwright,* 709 F.2d 1443, 1449 (11th Cir.1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). *See also McCleskey,* 107 S.Ct. at 1767.

In *McCleskey,* the United States Supreme Court recently faced an equal protection challenge to Georgia's death penalty statutes, similar to the challenge here. The defendant attempted to prove intentional discrimination through the use of two sophisticated statistical studies that examined over 2000 murder cases that occurred in Georgia in the 1970's. Despite the intricate statistics, which indicated that

---

**2.** Defendant's further allegation that intent to discriminate is shown by a comparison of this case with *State v. Tate,* 731 S.W.2d 846 (Mo.App. 1987), is answered in this Court's review of defendant's death sentence pursuant to § 565.-035, RSMo 1986.

killers of white victims and black defendants were more likely to receive death sentences, the Court declined to infer a discrimination intent on the part of prosecutors in seeking the death penalty, on the part of juries in giving the death penalty, or on the part of the Georgia legislature in enacting and maintaining the death penalty statutes. 107 S.Ct. at 1768–70. Accordingly, the Court rejected the defendant's equal protection claim. *Id.* at 1769–70. The basis of the Court's decision was that prosecutors, juries, and legislatures are vested with discretion in the making of their decisions. *Id.* at 1768–70. "Because discretion is essential to the criminal justice process," the Court demands "exceptionally clear proof" before it will infer that the discretion has been abused. *Id.* at 1769. The proffered statistics did not provide the required "exceptionally clear proof". *Id.* at 1769–70.

 Compared to the statistics introduced by the defendant in *McCleskey,* the statistics offered by the defendant here are superficial. Therefore, given that the *McCleskey* statistics were insufficient to establish an equal protection claim, the statistics offered here also are insufficient to establish such a claim.

 In addition to defendant's specific constitutional challenge to Missouri's death penalty statutes on the ground of discriminatory application, he also challenges the inherent constitutionality of Missouri's death penalty statutes, under both the United States and Missouri Constitutions. This Court has repeatedly rejected constitutional challenges to Missouri's death penalty statutes and does so again now. *See, e.g., State v. Driscoll,* 711 S.W.2d 512, 517 (Mo. banc), *cert. denied,* —— U.S. ——, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986); *State v. Newlon,* 627 S.W.2d 606, 611–13 (Mo. banc), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982).

Finally, defendant attacks the jury's imposition of the death penalty in this case. Defendant asserts that the sentence was imposed under the influence of prejudice and that the sentence is excessive and disproportionate to the penalty imposed in similar cases. These assertions will be considered within the Court's independent review of defendant's death sentence.

Section 565.035.3, RSMo 1986, mandates that the Court conduct an independent review of the imposition of all death sentences. That section requires the Court to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found.

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Defendant submits that his death sentence was imposed under the influence of passion, prejudice, and the arbitrary factor of his race.

Defendant's attack upon the motivations of the jurors in this case is supported by no direct evidence. There is, however, direct evidence that the jurors were not motivated by racism. During voir dire, the defense counsel questioned all potential jurors concerning their relationship and experience with blacks and whether those relationships and experiences would impair their ability to give defendant a fair trial. Out of a panel of approximately 80 persons, all but three testified, either by express statement or by silence to the defense counsel's questions, that they would have no problem in judging this case on the evidence without regard to race. The three who indicated that their racial views might impede them in judging the case fairly were excused for cause. There is no hint in the record that the venirepersons testified falsely or that race was a factor in the jury's decision.

Lacking any other evidence, defendant urges that this Court assume racial bias because, while he is black and his victim was white, the county in which he was tried

had no black residents, which resulted in a jury panel without blacks. Defendant also contends that racial prejudice on the part of the jury is apparent from a comparison of this case with *State v. Tate*, 731 S.W.2d 846 (Mo.App.1987), in which a white defendant who shot a highway patrol trooper received a sentence of life imprisonment, and with other capital cases.

The Court declines to infer racial prejudice on the part of a jury which sentences a black killer of a white victim to death simply because that jury was drawn from a county which has no black residents. To hold that racial prejudice on the part of a jury may be inferred from the absence of members of the defendant's race on the jury would be, in practical effect, to hold that the defendant has a right to members of his race on the jury. A defendant, however, has no right to a jury of any particular racial composition. *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975); *State v. Blair*, 638 S.W.2d 739, 753 (Mo. banc 1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983).

It is possible that defendant's position is broader than the assertion that prejudice should be inferred just from the lack of blacks on the jury. Defendant's position may be that the trial of a black in a county with no black residents to serve on juries inherently results in a jury motivated by prejudice because the jury members likely have had no personal experience with blacks and thus can act only on misconceptions about and stereotypes of blacks. Defendant points to no evidence to support such a proposition. This position is, in fact, refuted by the statements of the potential jurors during voir dire. When asked about their relationships and experiences with blacks, many indicated that they had regular contact with blacks or had previously lived in communities which did have black residents. A number of others had known blacks in the past. Given these personal contacts with blacks by many on the ve-

nire, there is no reason to suspect that this jury acted any more out of misinformation and prejudice than would have a jury drawn from a multiracial county.

Additionally, it is noted that defendant's trial occurred in the county in which it did, Schuyler County, as a result of defendant's own action. Because Trooper Froemsdorf was murdered in Perry County, he was originally held before the court in that county. Defendant moved for a change of venue, and this was granted, the case being transferred to Schuyler County. As Perry County is situated along the Mississippi River in Southeast Missouri and Schuyler County is located along the Iowa border, it can be assumed that venue was changed to Schuyler County in order to get the case moved as far north as possible to a county where reports of Trooper Froesmdorf's killing may have received less attention. There is not the slightest suggestion that race was a consideration in the decision to change the venue to Schuyler County. According to 1980 census statistics, Schuyler County contains 4964 white persons, 3 black persons. U.S. Bureau of Census, Census of Population and Housing (1980).

Just as no inference of racial prejudice on the part of the jury arises because of the racial composition of the county from which the jury was drawn, neither does such an inference arise from a comparison of this case with *State v. Tate*, 731 S.W.2d 846 (Mo.App.1987).[3] *Tate* and this case are superficially similar in that both involve defendants who killed highway patrol troopers. On this superficial level, the primary differences are that defendant here is black and received a death sentence while the defendant in *Tate* was white and received a sentence of life imprisonment. Defendant reasons that, because the offenses were identical, the disparate sentences can be explained only by reference to the race of the defendants.

---

**3.** This opinion may refer to some facts about *Tate* and other capital cases, in its comparison of those case with this one, which are not apparent from the opinions in those cases (such as the race of the defendant or victim). These facts have been gleaned from the records of capital cases which this Court keeps pursuant to § 565.035.6, RSMo 1986.

The explanation for the disparate sentences, however, far from being due to racial prejudice on the part of the jury, is found in the differences in the nature of the respective defendants. Up to the time of Tate's trial, he had never been convicted of any criminal offense. The only evidence before the jury of any prior criminal activity by Tate was testimony that he was wanted on an unspecified felony warrant at the time of his offense and that illegal weapons were present in his vehicle when he killed the highway patrol trooper. By contrast, defendant in this case had six felony convictions prior to the time he shot Trooper Froemsdorf and a substantial history of other criminal activity, including incidents of resisting arrest, the writing of $20,000 worth of bad checks to support a drug habit, the brandishing of a sawed-off shotgun in a residential area, and the commission of an armed robbery shortly before the murder of Trooper Froemsdorf. Another major distinction between Tate and the defendant here is that Tate, from at least the age of 13, was heavily influenced by and immersed in a militant and fanatical religious sect which justified violence as an appropriate defense when a member's freedom was threatened and which described members who were arrested as prisoners of war. In defense of Tate, it was argued that he was so influenced by this sect that he was not completely responsible for his actions. Extensive psychiatric testimony supported this theory. It was reasonable for the jury in Tate's trial to decline to impose the death penalty upon that misguided defendant. In comparison, defendant in this case was raised in a more typical environment. He grew up in a home free from abuse and neglect. Despite his supportive family, defendant, now 28, has engaged in numerous criminal forays since the age of 20. There is nothing to suggest that these forays were not the result of defendant's conscious and individual choice. Finding defendant guilty of deliberately killing Trooper Froemsdorf, the jury in this case was justified in imposing the death penalty. Far from being the result of racial prejudice, defendant's death sentence justifiably lays him in a bed of his own making.

Comparison of this case with other first degree murder cases in which the jury decided between sentences of death or life imprisonment also does not give rise to any inference that this defendant's death sentence was imposed under the influence of racial prejudice. On four occasions, excluding this case, a jury has been faced with the choice of whether to impose the death penalty or a life sentence upon a black defendant who has been found by it to be guilty of the first degree murder of a white law enforcement or corrections officer. *See State v. Baker,* 636 S.W.2d 902 (Mo. banc 1982), *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983); *State v. Shaw,* 636 S.W.2d 667 (Mo. banc), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982); *State v. Thomas,* 625 S.W.2d 115 (Mo.1981); *State v. Lomax,* 712 S.W.2d 698 (Mo.App.1986). The death penalty was imposed in *Baker* and *Shaw.* Life sentences were imposed in *Thomas* and *Lomax.* Comparing these cases with each other and with this case indicates no racial prejudice in the decision here but does indicate that juries are quite capable of considering the full range of punishment and of imposing just sentences in cases such as this one. There are also two cases involving the first degree murder of black police officers in which the choice of death or life imprisonment was submitted to the jury. *See State v. McDonald,* 661 S.W.2d 497 (Mo. banc 1983), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985); *State v. Sargent,* 702 S.W.2d 877 (Mo.App. 1985). The defendant in *McDonald* received the death penalty. The defendant in *Sargent* received a life sentence. The lesson from these two decisions is that juries are no more severe when the victim is a white law enforcement officer than they are when the victim is a black law enforcement officer.

The Court's conclusion with respect to the first prong of our independent review pursuant to § 565.035.3 is that defendant's sentence of death was not imposed under the influence of racial prejudice. Further, there is nothing in the record to suggest

that the sentence resulted otherwise from the influence of passion, prejudice, or any other arbitrary factor.

Turning to the second prong of § 565.035.3, the Court finds substantial evidence to support the jury's finding of the existence of the three submitted statutory aggravating circumstances. The evidence leaves no question that Trooper Froemsdorf was a peace officer killed while engaged in the performance of his official duties. The jury was justified in finding from the evidence that defendant slipped out of handcuffs and attacked Trooper Froemsdorf immediately prior to shooting him and thus that the murder was committed by a person who had escaped from the lawful custody of a peace officer. The evidence that defendant repeatedly beat Trooper Froemsdorf across the face with his still handcuffed left hand, that defendant temporarily incapacitated the trooper by firing a shot into the trooper's bullet-proof vest, and that defendant took advantage of this temporary incapacity by pumping not one, but two, .357 magnum slugs through the helpless trooper's neck, provided justification for the jury's finding that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind. *See State v. Newlon*, 627 S.W.2d 606, 622 (Mo. banc), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982).

In relation to the final prong of the Court's independent review of defendant's death sentence, defendant argues that the imposition of the death sentence in this case is excessive and disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant.

Defendant relies heavily on *State v. Tate*, 731 S.W.2d 846 (Mo.App.1987), to establish his claim that his death sentence is excessive and disproportionate. As stated above, *Tate* involved a defendant who received a life sentence after being convicted of the first degree murder of a highway patrol trooper. Even if this case and *Tate* were factually equivalent, this fact alone would not aid defendant. Any capital sentencing scheme may occasionally produce an aberrational outcome. *Pulley v. Harris*, 465 U.S. 37, 54, 104 S.Ct. 871, 881, 79 L.Ed.2d 29 (1984); *State v. Gilmore*, 681 S.W.2d 934, 946 (Mo. banc 1984). The issue when determining the proportionality of a death sentence is not whether any similar case can be found in which the jury imposed a life sentence, but rather whether the death sentence is excessive or disproportionate in light of "similar cases" as a whole. *See* § 565.035.3(3). In any event, there are substantial distinctions, discussed above, between this case and *Tate* which completely undercut defendant's argument that his sentence is excessive and disproportionate when compared with the sentence in *Tate*.

The Court has also reviewed the other cases in which the defendant was found guilty of the first degree murder of a law enforcement or corrections officer and in which the jury was given the choice of imposing either the death penalty or a life sentence. *See State v. Driscoll*, 711 S.W.2d 512 (Mo. banc) (death sentence), *cert. denied*, — U.S. —, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986); *State v. Roberts*, 709 S.W.2d 857 (Mo. banc) (death sentence), *cert. denied*, — U.S. —, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986); *State v. McDonald*, 661 S.W.2d 497 (Mo. banc 1983) (death sentence), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985); *State v. Davis*, 653 S.W.2d 167 (Mo. banc 1983) (life sentence); *State v. Baker*, 636 S.W.2d 902 (Mo. banc 1982) (death sentence), *cert. denied*, 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983); *State v. Shaw*, 636 S.W.2d 667 (Mo. banc) (death sentence), *cert. denied* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982); *State v. Thomas*, 625 S.W.2d 115 (Mo.1981) (life sentence); *State v. Lomax*, 712 S.W.2d 698 (Mo.App.1986) (life sentence); *State v. Carr*, 708 S.W.2d 313 (Mo.App.1986) (life sentence); *State v. Sargent*, 702 S.W.2d 877 (Mo.App.1985) (life sentence); *State v. Stephens*, 672 S.W.2d 714 (Mo.App.1984) (life sentence). Defendant's beating of Trooper Froemsdorf with his own handcuffs and his subsequent decision to fire two slugs through

the trooper's neck while the trooper was temporarily incapacitated rather than to take the opportunity to flee make this murder at least as heinous as those murders of law enforcement or corrections officers which resulted in death sentences. Defendant's extensive history of criminal activity distinguishes him from the defendants in the life sentence cases of *Sargent, Stephens* and *Davis.* The life sentence cases of *Lomax* and *Carr* are distinguishable from this case in that both Lomax and Carr killed in participation with others and the evidence was inconclusive as to who dealt the death blow. The defendant in the life sentence case of *Thomas* differs from defendant here in that Thomas' I.Q. was significantly lower than that of defendant here and there was also more substantial evidence of mental illness on the part of Thomas than there was on the part of defendant here. After examining these cases involving the murder of law enforcement and corrections officers and comparing them to this case, the Court concludes that the sentence in this case is neither excessive nor disproportionate.

The judgment is affirmed.

HIGGINS, C.J., RENDLEN, J., and SMITH, Special Judge, concur.

BLACKMAR and DONNELLY, JJ., dissent in separate opinions.

WELLIVER, J., dissents and concurs in dissenting opinion of DONNELLY, J.

ROBERTSON, J., not sitting.

BLACKMAR, Judge, dissenting.

## I.

I believe that MAI–CR2d 3.42 (then in effect) should have been given as requested. The evidence of the essential elements of premeditation and deliberation was wholly circumstantial. The defendant's admission as set out in the principal opinion simply showed that he was present at the scene and that he fired shots after a struggle in which he wrestled the gun from the

officer. If the jury believed his statement, conviction of first degree murder would be very doubtful.

As the principal opinion indicates, our decisions have announced in general terms a rule that, whenever both direct and circumstantial evidence are presented, MAI–CR2d 3.42 [1] need not be given. The principal opinion apparently would apply this rule expansively, so that the instruction is not required if there is any direct evidence of any element of the offense. This goes beyond the case law. In *State v. Griffin,* 662 S.W.2d 854 (Mo. banc 1983), *cert. denied,* 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 153 (1984), cited in the principal opinion, there was eyewitness testimony to the shooting. That case relied on *State v. Baldwin,* 571 S.W.2d 236 (Mo. banc 1978), in which the knife which was the subject of the charges was found concealed on the defendant's person. In other cases announcing the rule relied on in the principal opinion, there was also stronger direct evidence to support the convictions than was present in this case. *E.g., State v. Stevens,* 467 S.W.2d 10, 25 (Mo.), *cert. denied,* 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971); *State v. Aubuchon,* 394 S.W.2d 327, 336 (Mo.1965); *State v. Spica,* 389 S.W.2d 35, 52–53 (Mo.1965), *cert. denied,* 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966); *State v. Tallie,* 380 S.W.2d 425, 429 (Mo.1964); *State v. Loston,* 234 S.W.2d 535, 538 (Mo.1950).

The principal opinion sets out a lengthy chain of circumstances supporting the findings of deliberation and premeditation. It also demonstrates in detail circumstances showing that the defendant's explanation was unreasonable and incredible. The jury should have been told that it had the duty of making the indicated comparison of competing theories.

It has sometimes been said that an instruction along the lines of 3.42 might confuse the jury when there is direct evidence. There would be no confusion in this case because the jury was obliged to analyze evidence which was purely circumstantial

1. Now MAI–CR3d 310.02.

before it could find guilt of first degree murder. The instruction would be helpful to the jury and it should have had the benefit of it.

I can understand that the trial judge may have thought, from the Notes on Use, that he was not obliged to give this instruction,[2] but when the state seeks to take a life, the defendant should be afforded all available procedural safeguards.

## II.

For the reasons above assigned I am of the opinion that the case should be reversed and remanded for new trial, and so I would not reach the issue of proportionality review under § 565.035.2 and .3, RSMo 1986. Since the Court considers the point I vote for a mitigation of the sentence.

The comparison to the *Tate* case is patent. The principal opinion refers to this defendant's other convictions as a distinguishing feature. Balanced against those are Tate's having shot and seriously wounded a second trooper with intent to kill and his involvement in an incipient armed insurrection against the United States and the State of Missouri.

There is an inherent conflict between jury sentencing and proportionality review. In *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Court majority was disturbed about disparity in the application of capital punishment under existing statutes. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), considered that the modified statutes there considered would introduce elements of objectivity and uniformity into the administration of capital punishment and so once again allowed the states to reinstitute it. Now, in *McCleskey v. Kemp,* —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the Court majority appears to recognize that disparities are inevitable and

seems to take a position of indifference. Our duty under § 565.035 is not limited to the minimum that the Supreme Court of the United States might allow. We should strive to make sure that essentially similar offenses are similarly punished. Although the first degree murder of a law enforcement officer is a statutory aggravating circumstance supporting the death penalty, juries have reached divided conclusions in cases in which this circumstance is present.[3]

The racial question also impacts the issues. It is unfortunate that the judge initially assigned sent the case to a county in which there were no black residents available for jury service. I have every confidence that he did this for the sole reason that he wanted to get the case a long way away from Perry County, as the defendant requested, and without any racial motivation whatsoever. When the problem was called to the attention of the successor judge, however, I believe that the case should have been transferred to another county. We should be mindful of appearances when life is at stake. I do not suggest that the jurors of Schuyler County did not do their duty as they saw it, nor do I argue that a defendant is entitled to have persons of his own race on the panel. But the appearances remain.

I would exercise our duty to "consider the punishment" pursuant to § 565.035.2 by reducing the sentence to life imprisonment without probation or parole. In addition to the factors discussed earlier, I give attention to the nature of the homicide, which, although it could be found to be deliberate by the rather legal standard defining that term, was nevertheless quite impulsive.

The judgment should be reversed as to guilt and punishment and the case remanded for new trial.

---

**2.** 2. This instruction may be given even if *there is some direct evidence of guilt, though* it need not be given at all unless the evidence is wholly circumstantial.

**3.** *Compare State v. Thomas,* 625 S.W.2d 115 (Mo.1981), *State v. Lomax,* 712 S.W.2d 698 (Mo. App.1986), *State v. Sargent,* 702 S.W.2d 877 (Mo. App.1985), *State v. Stephens,* 672 S.W.2d 714 (Mo.App.1984) (life sentence cases) *with State v.*

*McDonald,* 661 S.W.2d 497 (Mo. banc 1983), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985) *and State v. Baker,* 636 S.W.2d 902 (Mo. banc), *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1982) (death sentence cases). In *McDonald,* the police officer was recognized as such by the defendant, even though he was not on duty.

DONNELLY, Judge, dissenting.

Whenever the death penalty is imposed in any case, "the sentence shall be reviewed on the record by the supreme court of Missouri" and this Court must determine whether such sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor * * *." § 565.035, RSMo 1986.

In *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980), the Court held "that if a State wishes to authorize capital punishment it has a constitutional responsibility to * * * apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." And the Court held that a death sentence cannot be permitted to stand when the circumstances under which it was imposed "create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." 446 U.S., at 427, 100 S.Ct., at 1764.

Given the circumstances in this case, I would set the judgment aside and resentence appellant to life imprisonment without eligibility for probation, parole, or release except by act of the governor.

I respectfully dissent.